In re MAIN, INC., Debtor.

Mitchell Miller, Esq., Trustee, Plaintiff

v.

Eric J. Blatstein, Lori J. Blatstein, Morris Lift, Airbev, Inc., Cobalt, Inc., Delawareco, Inc., Engine 46 Steak House, Inc., Pier 53 North, Inc., Reedco, Inc., Waterfront Management Corp., and Waterfront Valet, Inc.

Bankruptcy No. 96–19098DAS.
Adversary No. 98–0073.

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Dec. 7, 1999.

Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, PC, Philadelphia, PA, for Main, Inc.

Mitchell W. Miller, Philadelphia, PA, trustee for Main, Inc.

Eric L. Frank, Philadelphia, PA, General Counsel for trustee Miller.

Steven M. Coren, Philadelphia, PA, Special Counsel for trustee Miller.

Edward J. DiDonato, DiDonato & Winterhalter, P.C., Philadelphia, PA, for Eric J. Blatstein.

Michael H. Kaliner, Fairless Hills, PA, trustee in Blatstein case.

B. Christopher Lee, Philadelphia, PA, for Jacoby Donner and Corporate defendants.

Kevin J. Carey, Mesirov Gelman Jaffe Cramer & Jamieson, Philadelphia, PA, for Lori J. Blatstein.

Joel W. Todd, Dolchin, Slotkin & Todd, PC, Philadelphia, PA, Possibly Present Attorney for Morris Lift.

W.J. Winterstein, Jr., Philadelphia, PA, Former Attorney for Morris Lift.

Frederic Baker, Philadelphia, PA, Ass't. U.S. Trustee.

## SUPPLEMENTAL OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The seemingly modest purpose of the instant decision is to decide claims asserted by MITCHELL W. MILLER, ESQUIRE, the trustee ("the Trustee") in the MAIN, INC. ("the Debtor") Chapter 7 bankruptcy case ("the Trustee"), against ERIC J. BLATSTEIN ("Blatstein") and his wife, LORI J. BLATSTEIN ("Lori," with Blatstein, "the Blatsteins"), for their receipt of alleged excess salaries from the Debtor, and their alleged negligent incurrence of tax penalties on behalf of the Debtor, which were left unresolved in our previous Opinion of September 22, 1999, now reported at 239 B.R. 281 and designated herein as *"Main IX"*, and thus it supplements *Main IX*. With one exceptions noted at pages 576–77 *infra*, all of the other references to prior decisions arising out of the Debtor's and Blatstein's bankruptcy cases utilized herein are consistent with the references utilized in *Main IX*.

Considering the record compiled at a post-*Main IX* supplemental trial of October 29, 1999 ("the Trial"), we find that the Blatsteins met their burden of proof, through their counter-analysis of the sums properly designated as salaries received and unrebutted expert testimony, that they did not receive excessive salaries from Debtor. We also find that the Blatsteins are liable for only $6669.50, the sole amount proven to be attributable to penalties for their failure to timely pay tax obligations, holding that the Trustee was obliged to pay some of the taxes at issue and that the Blatsteins failed to establish that nonpayment of this sum was justified under the "business judgment" rule.

### B. FACTUAL AND PROCEDURAL HISTORY

The increasingly complex procedural history of the adversary proceedings arising out of the bankruptcy cases of the Debtor and its principal Blatstein are outlined in *Main IX* and a decision of September 17, 1999, now reported at 239 B.R. 59, to which we described Main IX as a "companion piece" and which is referenced herein as *"Main VIII"* rather than, as in

*Main IX,* "the 9/17 Opinion." We will not repeat all of prior history set forth therein anew. We will recite herein, as relevant facts, only those developed at the Trial.

The interested reader will be asked to recall that, in *Main IX,* we found the Blatsteins liable to the Trustee for the entire $685,520.78 which we had declared to be the sum remaining due from the nondebtor corporations owned by the Blatsteins ("the Nondebtors") to the Debtor upon application of the ruling of the District Court in *Main VII,* reported at 1999 WL 424296 (E.D.Pa. June 23, 1999), that the Blatsteins could avoid such liability only by proving that they had good business reasons for effecting the advances from the Debtor to the Nondebtors. We concluded in *Main IX,* 239 B.R. at 288–92, that they had failed to do so. However, we further found that we could resolve the issues of whether the Blatsteins were also liable for receipt of excessive salaries and certain tax penalties allegedly imposed upon the Debtor only upon application of the principles of *Main VII,* at *16 and *20–*21, respectively, to more specific facts than those in the record to date. *Main IX,* 239 B.R. at 292–96. In that Opinion, we therefore scheduled a hearing after the remand on October 6, 1999. *Id.* at 296–97.

Prior to October 6, 1999, we were advised that accountant Harvey W. Grossman, the Trustee's principal expert witness, was out of the country until later that month. We therefore ultimately entered an Order of October 7, 1999, rescheduling the Trial on October 29, 1999, on a must-be-heard basis.

The six-hour Trial was in fact conducted on October 29, 1999. Testimony was adduced by the Trustee from Grossman only. The Blatsteins called George W. Miller, the expert accountant previously testifying on behalf of them and the Nondebtors; Dean W. Laskaris, an expert in the food and beverage industry; and Blatstein. The Trustee's evidence at the hearing consisted of (1) Grossman's presentation of a voluminous comprehensive report ("the Trustee's Report") covering the years 1994 through 1997, detailing and providing back up for each and every alleged payment conceivably made by Philly Rock Bar and Grill ("Philly Rock") to or for the benefit of the Blatsteins; and (2) a five-page report ("the Tax Report") for the years 1996, 1997, and 1998, showing that Philly Rock allegedly incurred certain tax penalties.

The Trustee's Report hypothesized that the Blatsteins received $1,158,866.93 in payments in the nature of compensation during the period covered. This dollar amount was broken down by the Trustee as follows:

**TABLE 1**
**COMPENSATION RECEIVED BY THE BLATSTEINS AS CLAIMED BY THE TRUSTEE**

| YEAR | DOLLAR AMOUNT |
| --- | --- |
| 1994 | $ 177,130.77 |
| 1995 | $ 587,489.09 |
| 1996 | $ 336,352.59 |
| 1997 | $ 57,894.88[1] |
| **TOTAL DOLLAR AMOUNT** | $1,158,866.93 |

The Blatsteins, in response, introduced (1) Miller's analysis of the Trustee's Report; (2) Miller's own exhibits showing his version of the compensation paid to the Blatsteins from 1994 through 1997; (3) Laskaris' expert opinion of the reasonable rate of compensation in restaurants similar in size and revenues to Philly Rock; and (4) Blatstein's testimony regarding Philly Rock's operations. Miller thoroughly reviewed and analyzed the Trustee's Report and, almost needless to say, presented some very different opinions and dollar figures regarding the salary compensation received by the Blatsteins from 1994 through 1997, which concluded as follows:

---

1. The Trustee's Report lists this dollar figure as $57,864.88. However, a close scrutiny of the figures submitted by the Trustee reveals a mathematical error of $30.00. Accordingly, we have corrected the total amount to $57,-894.88.

**TABLE 2**
**COMPENSATION RECEIVED BY THE**
**BLATSTEINS AS CLAIMED BY MILLER**

| YEAR | DOLLAR AMOUNT |
|---|---|
| 1994 | $ 39,842.35[2] |
| 1995 | $415,416.40 |
| 1996 | $ 76,967.69 |
| 1997 | $ 2,911.17 |
| TOTAL DOLLAR AMOUNT | $535,137.61[3] |

At the outset, we note that the Trustee's present figure for the Blatsteins' alleged excessive salaries is approximately $100,500 higher than any of their figures presented previously and is over three times the amount which the District Court believed was at issue on this point. *See Main IX,* 239 B.R. at 292–93, citing *Main VII,* at *12.

Similarly, the alleged tax liability for which the Trustee now attempts to hold the Blatsteins liable, although covering the same period as before, has grown from the range of $10,000 to $15,000, *Main VI,* 1998 WL 601249, at *2, to $20,873, *Main VII,* at *20, to $33,256.99, itemized by Grossman at the Trial as follows:

**TABLE 3**
**TAX PENALTIES ALLEGED BY THE TRUSTEE TO BE OWED**
**TO THE DEBTOR BY THE BLATSTEINS**

| | TAXING AUTHORITY | YEAR | DOLLAR AMOUNT OWED |
|---|---|---|---|
| 1. | Internal Revenue Service | 1996 | $ 2,754.70 |
| 2. | Jefferson Bank (tax authority not identified) | 1996 | $ 1,507.72 |
| 3. | Internal Revenue Service | 1997 | $19,683.05 |
| 4. | Pennsylvania Department of Revenue | 1997 | $ 872.83 |
| 5. | City of Philadelphia | 1997 | $ 317.20 |
| 6. | Internal Revenue Service | 1998 | $ 7,996.49 |
| 7. | City of Philadelphia | 1998 | $ 125.00 |
| | TOTAL DOLLAR AMOUNT OWED | | $33,256.99 |

Miller, meanwhile, contended that little or no evidence of the Debtor's liability for the tax penalties exists, let alone evidence that the Blatsteins are liable for same. Miller observed that the only support for all but one of the sums claimed by the Trustee as tax penalties were entries in the Debtor's general ledger under headings "Taxes & penalties" and "Fines & penalties." The one exception is a Notice from the Internal Revenue Service ("the IRS") dated October 13, 1997, indicating that Columbusco, Inc. ("CCO") was liable for penalties of $6669.50 relating to Philly Rock for the tax period ending June 30, 1997. While arguing that, for the most part, no tax penalty obligations existed for the Debtor, the Blatsteins claim, assuming *arguendo* that there were, that Blatstein made a legitimate business decision to pay other debts and vendors ahead of the obligations owed to the taxing authorities. To justify their actions, the Blatsteins cite authority adopting the "business judgment

---

2. Miller's analysis of the compensation received by the Blatsteins in 1994 lists this dollar figure as $41,842.35. A further review of this figure, however, reveals that Miller failed to subtract two 1994 $1,000 transfers erroneously counted by the Trustee. Therefore, the figure under scrutiny should be listed as $39,842.35. We have corrected the same for the purposes of our analysis.

3. Miller's analysis of the compensation received by the Blatsteins lists this dollar figure as $540,137.61. Nevertheless, a close scrutiny of the figures submitted by Miller reveals an additional mathematical error of $3,000. As we did with the Trustee's Report, we have corrected the error in question for the purposes of our analysis and listed the same as the correct total amount of $535,137.61.

rule" and claim that they reasonably believed their conduct to be appropriate under the circumstances.

We note, as we did in *Main II*, 213 B.R. 67, 77, *modified in part*, 1997 WL 626544 (Bankr.E.D.Pa. Oct. 7, 1997) (*"Main III"*), *aff'd in part & rev'd & remanded in part sub nom. In re Blatstein*, 226 B.R. 140 (E.D.Pa.1998) (*"Blatstein II"*), *reinstated as to issues remanded*, 1998 WL 778017 (Bankr.E.D.Pa. Nov. 4, 1998) (*"Main IV"*), *aff'd as to issues remanded*, 1999 WL 689715 (E.D.Pa. Sept. 3, 1999) (*"Blatstein III"*) *Blatstein II aff'd. in part and rev'd in part as to issues not remanded*, 192 F.3d 88 (3d Cir.1999) (*"Blatstein IV"*), that Miller has a very broad and significant experience in numerous bankruptcy cases in this jurisdiction, usually in the employ of trustees. During the course of his testimony, he proved to be very knowledgeable about the subject matter and well versed on the claims at hand. Miller was, however, occasionally overly aggressive in defending himself from what he claimed were distortions of the facts and the dollar amount figures introduced by the Trustee. Grossman, on the other hand, could not equal the specialized experience of Miller in terms of working with bankrupt debtors and testifying in bankruptcy cases. Nonetheless, as we held in *Main II*, 213 B.R. at 77, he also presented himself as a knowledgeable, competent, and credible witness for the Trustee.

Laskaris reviewed and analyzed the tax returns filed by the Debtor, as well as the Trustee's Report. He was of the opinion that, in consideration for the creative services performed by Blatstein in establishing and developing Philly Rock's success, a reasonable rate of compensation would range between a six (6%) to ten (10%) percent of Philly Rock's gross annual revenues. The parties apparently agree that Philly Rock had gross revenues of approximately $13 million over the four-year period under scrutiny, which would mean that compensation for this period in excess of $1 million, as alleged by the Trustee, could

be "fair and reasonable" under the current industry standards. Like Grossman and Miller, Laskaris presented himself as a competent, credible witness.

Finally, Blatstein offered testimony about the management of Philly Rock, noting that he was responsible for every facet of its operations. He also testified without contradiction about Lori's role in the Philly Rock business as designing and planning color schemes, menus, promotional events, concepts, media, and related duties. Blatstein presented himself as a credible witness on these points.

After the completion of the Trial, we entered an Order of November 1, 1999, directing the parties to file simultaneous briefs in support of their respective positions on the matters at hand on or before November 12, 1999. That Order also addressed the remand effected in *Blatstein IV*, which the District Court in turn remanded to us by an Order of October 15, 1999, which we learned about for the first time in the course of the Trial. With respect to that issue, measuring the practical effect of the decision of the Court of Appeals that Blatstein fraudulently conveyed certain of his earnings to Lori, the parties agreed to simultaneously submit opening briefs by December 17, 1999, and reply briefs by December 30, 1999. Conceivably, this would be the last issue before us arising out of these cases. We note, however, that *Main VIII* was appealed to the District Court and that portion of *Main VII*, at *5–*11, holding Cobalt, Inc. responsible for the liability of Delawareco, Inc. ("DECO") to the Debtor was appealed to the Court of Appeals. The latter appeal appears to have been rendered moot by Blatsteins' settlement of the *Main IX* judgment against DECO.

## C. *DISCUSSION*

1. *The Blatsteins Presented Sufficient Evidence to Establish that They Did Not Receive Excessive Salaries from the Debtor.*

In arguing that, between 1994 and 1997, the Blatsteins received $1,158,866.93 in

compensation from the Debtor, the Trustee breaks down the sources of the $177,130.37 payments for 1994 as follows:

TABLE 4
**1994 COMPENSATION ALLEGED BY THE TRUSTEE TO HAVE BEEN PAID
BY THE DEBTOR TO OR FOR THE BENEFIT OF THE BLATSTEINS**

| WORK PAPER REF.# | NATURE OF SALARY COMPENSATION PAID | DOLLAR AMOUNT |
|---|---|---|
| 2000 | Checks not recorded on the general ledger | $ 21,024.91 |
| 2004 | Officers' loan account (07/01/94 – 12/31/94) | $ 37,755.46 |
| 2092 | $ 1,150 weekly payments to Morris Lift | $ 35,650.00 |
| 2093 | Payments to Gayl Beratan (05/01/94 – 12/31/94) | $ 34,000.00 |
| 2098 | Cash payouts to Eric Blatstein not properly recorded | $ 17,100.00 |
| 13000 | Payments to Harry Blatstein (07/01/94 – 12/31/94) | $ 31,600.00 |
| | **TOTAL DOLLAR AMOUNT** | **$177,130.37** |

Next, the Trustee maintained that in 1995 the Blatsteins' total dollar amount in compensation consisted of $587,489.09, broken down as follows:

TABLE 5
**1995 COMPENSATION ALLEGED BY THE TRUSTEE TO HAVE BEEN PAID
BY THE DEBTOR TO OR FOR THE BENEFIT OF THE BLATSTEINS**

| WORK PAPER REF.# | NATURE OF SALARY COMPENSATION PAID | DOLLAR AMOUNT |
|---|---|---|
| 2005 | Officers' loan account (01/01/95 – 09/19/95) | $215,922.29 |
| 2010 | Officers' loan account (09/25/95 – 12/28/95) | $ 62,501.80 |
| 2092 | $ 1,150 weekly payments to Morris Lift | $ 56,350.00 |
| 2095 | Payments to Gayl Beratan | $ 52,000.00 |
| 2098 | Cash payouts to Eric Blatstein not properly recorded | $ 30,600.00 |
| 2100 | Salary—Eric Blatstein | $146,900.00 |
| 3100 | Salary—Lori Blatstein | $ 3,400.00 |
| 14000 | Salary—Ruth Lift | $ 5,200.00 |
| 13000 | Payments to Harry Blatstein | $ 14,615.00 |
| | **TOTAL DOLLAR AMOUNT** | **$587,489.09** |

Further, the Trustee contended that for the year 1996 the Blatsteins' compensation totaled $336,352.59, broken down as follows:

TABLE 6
**1996 COMPENSATION ALLEGED BY THE TRUSTEE TO HAVE BEEN
PAID BY THE DEBTOR TO OR FOR THE BENEFIT OF THE BLATSTEINS**

| WORK PAPER REF.# | NATURE OF SALARY COMPENSATION PAID | DOLLAR AMOUNT |
|---|---|---|
| 2020 | Main, Inc., Officers' loan account | $112,695.08 |
| 2060 | Columbusco, Officers' loan account | $ 83,141.20 |

| 2091 | Columbusco payments to Ed Brotsky | $ 21,000.00 |
| 2092 | $ 1,150 weekly payments to Morris Lift | $ 48,300.00 |
| 2097 | Payments to Gayle Beratan | $ 53,000.00 |
| 2098 | Cash payouts to Eric Blatstein not properly recorded | $ 15,135.00 |
| 3010 | Lori Blatstein Main, Inc., loan activity | $ 3,081.31 |
| | **TOTAL DOLLAR AMOUNT** | **$336,352.59** |

Finally, the Trustee argued that in 1997 the Blatsteins received a total dollar amount of $57,894.88 in compensation, broken down again as follows:

**TABLE 7**
**1997 COMPENSATION ALLEGED BY THE TRUSTEE TO HAVE BEEN PAID
BY THE DEBTOR TO OR FOR THE BENEFIT OF THE BLATSTEINS**

| WORK PAPER REF.# | NATURE OF SALARY COMPENSATION PAID | DOLLAR AMOUNT |
|---|---|---|
| 2070 | Officers' loan account | $48,122.88 |
| 2098 | Cash payouts to Eric Blatstein not properly recorded | $ 2,372.00 |
| 3020 | Lori Blatstein Columbusco, Inc., loan activity | $ 7,400.00 |
| | **TOTAL DOLLAR AMOUNT** | **$57,894.88** |

To support all of the foregoing dollar figures, the Trustee thus relied solely on Grossman's expert testimony and his explanation of the contents of the Trustee's Report, which he had prepared.

The Blatsteins, on the other hand, contended that the total dollar amounts received as compensation for the four-year period under scrutiny totaled only $535,137.61. According to them, for the year 1994, the compensation received was not $177,130.37, as alleged by the Trustee, but $39,842.35, itemized as follows:

**TABLE 8**
**1994 COMPENSATION CLAIMED BY THE BLATSTEINS TO HAVE BEEN PAID
BY THE DEBTOR TO OR FOR THEIR BENEFIT**

| WORK PAPER REF.# | NATURE OF SALARY COMPENSATION PAID | DOLLAR AMOUNT |
|---|---|---|
| 2000 | Checks not recorded on the Debtor's general ledger | $15,024.91 |
| 2098 | Cash payouts to Eric Blatstein not properly recorded | $ 0.00 |
| 13000 | Officers' loan account | $24,817.44 |
| | **TOTAL DOLLAR AMOUNT** | **$39,842.35** |

To support these figures, the Blatsteins referred to Miller's review and analysis of the Trustee's Report at the Trial and argued that (1) since the bankruptcy petition was filed on September 20, 1996, and the Trustee's cause of action rests on a breach of their fiduciary duties, the applicable two-year statute of limitations, 42 Pa.C.S. §§ 5524(2), (3), (7), expired as to all claims prior to the filing 11 U.S.C. § 108(a). Accordingly, any and all compensation predating September 20, 1994, must be removed from the claims asserted by the Trustee; and (2) the Trustee failed to account for $12,938.02 of loan repayments deposited by Blatstein in the officers' loan account. Once these repayment monies were removed and the payments made to

Morris Lift ($35,650.00), Gayl Beratan ($34,000), and Harry Blatstein ($31,600) were eliminated, which they contended would be appropriate, the total dollar amount paid by the Debtor to or for the benefit of the Blatsteins in 1994 amounted to no more than $39,842.35.

Next, the Blatsteins argued that for 1995 their compensation received was not $587,489.09, but $415,416.40, itemized as follows:

### TABLE 9
### 1995 COMPENSATION CLAIMED BY THE BLATSTEINS TO HAVE BEEN PAID BY THE DEBTOR TO OR FOR THEIR BENEFIT

| WORK PAPER REF. # | NATURE OF SALARY COMPENSATION PAID | DOLLAR AMOUNT |
|---|---|---|
| 2005 | Officers' loan account (01/01/95 – 09/19/95) | $209,400.63 |
| 2010 | Officers' loan account (09/20/95 – 12/31/95) | $ 47,215.77 |
| 2098 | Cash payouts to Eric Blatstein not properly recorded | $ 8,500.00 |
| 2100 | Salary—Eric Blatstein | $146,900.00 |
| 3100 | Salary—Lori Blatstein | $ 3,400.00 |
| | **TOTAL DOLLAR AMOUNT** | $415,416.40 |

In presenting these alternative figures, the Blatsteins relied on Miller's review and analysis of the Trustee's Report and claimed that the Trustee's mathematical calculations of the compensation received in 1995 failed to record various credits to the Blatsteins, including: (1) $6,521.66 not deducted from the officers' loan account; (2) a $10,000 cash deposit made on October 16, 1995, not credited to the officers' loan account; (3) a voided check in the amount of $5,286.03 not subtracted from the officers' loan account; and (4) monies paid to Kenneth Shoop, the Debtor's controller, in the amount of $22,100, which were not deducted from the cash payouts received by Blatstein in 1995. The Blatsteins also

note that the Trustee neglected to eliminate $128,165 in payments to persons other than them in addition to Shoop. That is, the Trustee included $56,350 paid to Morris Lift, $52,000 paid to Gayl Beratan, $5,200 paid to Ruth Lift, and $14,615 paid to Harry Blatstein, not to them. Upon subtraction of these sums, the Blatsteins admitted that their compensation for the year 1995 amounted to a still-considerable sum of $415,416.40.

The Blatsteins further argued that for 1996 their compensation received resulted in $76,967.69, instead of $336,352.59 as claimed by the Trustee, itemized by them as follows:

### TABLE 10
### 1996 COMPENSATION CLAIMED BY THE BLATSTEINS TO HAVE BEEN PAID BY THE DEBTOR TO OR FOR THEIR BENEFIT

| WORK PAPER REF. # | NATURE OF SALARY COMPENSATION PAID | DOLLAR AMOUNT |
|---|---|---|
| 2020 | Main, Inc., Officers' loan account | $62,695.08 |
| 2060 | Columbusco, Officers' loan account | $83,141.20 |
| 2098 | Cash payouts to Eric Blatstein not properly recorded | $ 750.00 |
| 3010 | Lori Blatstein Main, Inc., loan activity | ($11,918.69) |
| | Payment of pre-petition payroll taxes for City of Philadelphia | ($57,699.90) |
| | **TOTAL DOLLAR AMOUNT** | $76,967.69 |

To support these figures, the Blatsteins again relied on Miller's review and analysis of the Trustee's Report and pointed out his hearing testimony indicating that the mathematical calculations presented by the Trustee should be additionally reduced by $259,384.90 for a total dollar amount of $76,967.69. These additional reductions consist of (1) $101,300 in payments made to Morris Lift and Gayl Beratan; (2) $50,000 of the Debtor's officers' loan account paid to Reedco, Inc., pursuant to our original decision in the Proceeding in *Main V*, 223 B.R. 457, 468 (Bankr.E.D.Pa.1998); (3) $21,000 in payments made by CCO to Ed Brotsky; (4) $14,385 in cash payouts to Blatstein paid to the latter's handyman for leasehold improvements and fixed equipment; (5) $15,000 not credited to Lori's loan activity account for the Debtor; and (6) $57,699.90 paid as part of an agreement with the City of Philadelphia for pre-petition payroll taxes.

Next, the Blatsteins asserted that in 1997 their compensation received consisted of only $2,911.17, not $57,894.88 as listed on the Trustee's Report, itemized as follows:

### TABLE 11
### 1997 COMPENSATION CLAIMED BY THE BLATSTEINS TO HAVE BEEN PAID BY THE DEBTOR TO OR FOR THEIR BENEFIT

| WORK PAPER REF. # | NATURE OF SALARY COMPENSATION PAID | DOLLAR AMOUNT |
|---|---|---|
| 2070 | Officers' loan account | $48,122.88 |
| 2098 | Cash payouts to Eric Blatstein not properly recorded | $ 2,372.00 |
| 3020 | Lori Blatstein Columbusco, Inc., loan activity | ($47,583.71) |
| | **TOTAL DOLLAR AMOUNT** | $ 2,911.17 |

In support of these figures, the Blatsteins again referred to Miller's review and analysis of the Trustee's Report and claimed that the Trustee neglected to credit $54,983.71 in payments of taxes ($53,813.71) and liquor licensing fees ($1,170.00) from the Lori's CCO loan activity account. According to the Blatsteins, that credit reduced the Trustee's 1997 compensation figure to $2,911.17.

The Blatsteins argued that the Trustee has therefore greatly inflated the amounts which conceivably could have been considered as salary to them, by means of Miller's analyses. They further contended that they have met their burden of proof that the sums received were reasonable by means of Laskaris' testimony and that we must therefore conclude that the compensation paid to them over the four-year period under scrutiny was reasonable and fair.

■ We believe that the Blatsteins' position with respect to the total dollar amount received as compensation for the four-year period under scrutiny is correct. One legal argument advanced by the Blatsteins is that payments preceding the period two years before the Debtor's bankruptcy filing, *i.e.*, all payments prior to September 20, 1994, are barred by limitations, pursuant to 42 Pa.C.S. §§ 5524(2), (3), (7). While the commencement of the Proceeding on February 9, 1998, preserved any claims as to which limitations had not run before the date of filing, 11 U.S.C. § 108(a)(2), it could not resurrect those as to which limitations had already run.

The Trustee argued, but did not prove, that the Blatsteins' conduct was ongoing and was not discovered until some undesignated date after the two-year period had run. However, we conclude that the Trustee was cognizant of the general facts underlying his potential claims against the Blatsteins since at least the dates of the filings of the *Main II* lawsuits on January 3, 1997, and January 7, 1997, respectively.

Nevertheless, instead of pursuing these particular claims, first enunciated in the Proceeding, he initially asserted the alter ego claims to remedy these activities, which claims were ultimately finally rejected in *Blatstein IV.* Therefore, as to the relatively modest amount of claims which they contended are barred by limitations, the Blatsteins are correct.

In addition to this deduction on account of limitations, which we compute to be $23,100, we also believe that payments made to or for the benefit of persons other than the Blatsteins must be deducted from the total dollar amount claimed by the Trustee for a total reduction of $500,-883.61, the amounts of which are illustrated below:

### TABLE 12
### PAYMENTS MADE TO OR FOR THE BENEFIT OF PERSONS OR ENTITIES OTHER THAN THE BLATSTEINS

| | NAME OF PERSON OR ENTITY (years) | | DOLLAR AMOUNT RECEIVED |
|---|---|---|---|
| 1. | Gayl Beratan | (1994, 1995, 1996) | $139,000.00 |
| 2. | Harry Blatstein | (1994, 1995) | $ 46,215.00 |
| 3. | Ed Brotsky | (1996) | $ 21,000.00 |
| 4. | City of Philadelphia | (1996) | $ 57,699.90 |
| 5. | Frank (Blatstein's handyman) | (1996) | $ 14,385.00 |
| 6. | Internal Revenue Service | (1997) | $ 53,813.71 |
| 7. | Morris Lift | (1994, 1995, 1996) | $140,300.00 |
| 8. | Ruth Lift | (1995) | $ 5,200.00 |
| 9. | Ken Shoop | (1995) | $ 22,100.00 |
| 10. | Ed Taraskus | (1997) | $ 1,170.00 |
| | **TOTAL DOLLAR AMOUNT REDUCTION** | | **$500,883.61** |

Although we stated at various points in passing in *Main II* that the Debtor's payments to many of these parties were for the benefit of the Blatsteins as well as their present and former corporate entities, 213 B.R. at 75–76, 89–90, we merely meant that these payments were made at the behest of the Blatsteins on behalf of their various entities, not that these payments were pocketed by the Blatsteins themselves as salary. For example, in *Main V,* we attributed the payments by Ed Brotsky and Fred Silver, 223 B.R. at 468, to other Nondebtors. The liabilities of those Nondebtors to repay the Debtor were part of the judgment already payable to the Trustee under the judgment entered against the Blatsteins in *Main IX.* The Trustee is not entitled to count these payments twice, or even once, as salaries to the Blatsteins personally.

Further, the monies identified by Miller as monies owed to, repaid by, or properly credited to the Blatsteins must be further deducted from the total dollar amount at issue for a final reduction of $99,745.71, itemized as follows:

## TABLE 13
### MONIES OWED TO, REPAID BY, OR CREDITED TO THE BLATSTEINS

| NATURE OF THE MONIES IN QUESTION (year) | | DOLLAR AMOUNT RECEIVED |
|---|---|---|
| 1. Loan repayment monies not reflected in officers' loan account | (1994) | $12,938.02 |
| 2. Monies owed to Blatstein not deducted from officers' loan account | (1995) | $ 6,521.66 |
| 3. Cash deposit not credited on officers' loan account | (1995) | $10,000.00 |
| 4. Voided check not credited on officers' loan account | (1995) | $ 5,286.03 |
| 5. Loan repayment monies not reflected in the Main, Inc., officers' loan account | (1996) | $50,000.00 |
| 6. Loan repayment monies not credited in the Lori Blatstein, Main, Inc., loan activity account | (1996) | $15,000.00 |
| **TOTAL DOLLAR AMOUNT REDUCTION** | | **$99,745.71** |

We note that, at no time during the course of the Trial did the Trustee offer any evidence or testimony to directly rebut Miller's specific itemizations of adjustments to the Trustee's Report. Instead, the Trustee's case consisted solely of Grossman's testimony regarding the preparation and itemization of the payments and dollar amount figures contained in the Report.

The Trustee's brief contains no specific counter-analyses, either. Thus, the Trustee simply referred to Miller's review and analyses of the payments and dollar figures at issue as the "overzealous advocacy of a hired gun." In the absence of any affirmative evidence or references to the well-developed record to effectively refute Miller's contentions, we are inclined to credit the latter's review and analyses of the payments and dollar amount figures in question. Therefore, we are convinced that, if we apply Miller's dollar deduction figures to the "excessive salary" claims asserted by the Trustee, we derive the actual compensation received by the Blatsteins during the four-year period under scrutiny as a total dollar amount of $535,137.61. The mathematics involved in this analysis are as follows:

| | |
|---|---|
| COMPENSATION CLAIMED BY THE TRUSTEE | $ 1,158,866.93 |
| ADJUSTMENTS | |
| COMPENSATION PREDATING 09/20/94 | $ 23,100.00 |
| PAYMENTS MADE TO OR FOR THE BENEFIT OF PERSONS OTHER THAN THE BLATSTEINS | $ 500,883.61 |
| MONIES OWED TO, REPAID BY, OR CREDITED TO THE BLATSTEINS | $ 99,745.71 |
| SUBTOTAL OF ADJUSTMENT | $ (623,729.32) |
| ADJUSTED COMPENSATION RECEIVED | $ 535,137.61 |

We now proceed to determine whether, in receiving these sums, the Blatsteins obtained excessive salaries from the Debtor in breach of their fiduciary duties and therefore are personally liable to the Trustee in any amount. In his brief the Trustee argues that the Blatsteins, as directors, officers, and controlling shareholders of the Debtor, are personally liable to it for breaching their fiduciary duties to it. According to the Trustee, neither the officers nor directors of a corporation can lawfully draw corporate funds for their own personal use. To support these arguments, the Trustee relied upon and quoted, as did the District Court in *Main VII,* at

*12–*15, from the portions of our previous analysis in *Main V*, 223 B.R. at 471–73, describing the legal obligations of officers, directors and sole shareholders in connection with our rulings against Waterfront Management Co. ("Management") in connection with the claims that it was overcompensated. *Id.* at 473–76. Of course, we later held that these principles did not justify the conclusion that the Blatsteins received excessive salaries. *Id.* at 476–79.

The Trustee nevertheless cited again to the authority which we distinguished there, *Flannery Bolt Co. v. Flannery*, 16 F.Supp. 803, 805 (W.D.Pa.1935), *aff'd as modified*, 86 F.2d 43 (3rd Cir.1936). He also maintained that the Blatsteins provided few, if any services, for Philly Rock and noted that the Blatsteins neither managed Philly Rock on a daily basis, nor supervised the bookkeeping operation of the business at hand. The Trustee further maintained that, to the extent the Blatsteins performed any services for Philly Rock, they performed those services as employees of Management. Moreover, the Trustee averred that Blatstein offered no credible evidence concerning the total hours he actually worked or the particular services he actually performed exclusively for Philly Rock during the four-year period under scrutiny. Without such evidence, the Trustee contended that any determination of reasonable compensation would be purely speculative. Finally, the Trustee argued that our previous establishment of management fees at 3.5% of the gross revenues of Philly Rock in *Main V*, 223 B.R. at 473–76, collaterally estopped the Blatsteins from arguing that they were entitled to compensation in addition to that amount.

As to Lori's liability, the Trustee asserted that she had not met her burden of proving that she was entitled to draw any compensation from the Debtor for services rendered. In making this assertion, the Trustee noted that, like her husband, Lori drew a modest salary from Management commensurate with her provision of few meaningful services for Philly Rock. As a result, the Trustee maintained that there is no basis in the record for concluding that Philly Rock funds advanced to or on behalf of Lori were reasonable in light of her services to the Debtor.

The Blatsteins countered by noting that the compensation received by them in addition to their management fees between 1994 and 1997 were fair and reasonable in light of the work performed, their accomplishments and responsibilities, and the great success of the Philly Rock business. In support of these contentions, the Blatsteins relied on (1) Miller's review and analysis of the Trustee's Report; (2) Laskaris' expert opinion of the reasonable rate of compensation in restaurants similar in size and revenues to Philly Rock; and (3) the testimony of Blatstein himself. The Blatsteins, we hold properly, maintained that the compensation received over the applicable time-period under scrutiny totaled $535,137.61. Therefore, they argued that the appropriate analysis to determine the reasonableness of their compensation obtained would be to average these figures over the four-year period in question and conclude that an average annual salary of $133,784.40 for a business grossing over $3.5 million annually was reasonable and fair in light of their responsibilities for the creation of every facet of the Philly Rock operation.

We continue to believe that the Blatsteins' position with respect to the salaries received is defensible. At the Trial Blatstein testified without contradiction that he created the concept and format of the Philly Rock business and was responsible for oversight of every aspect of its operation. Blatstein also testified that revenues for the Philly Rock business increased dramatically from $2.1 million in 1993 to over $3.5 million in 1997, for which he justifiably claimed credit. Blatstein's testimony confirmed that he was responsible for reviewing any and all costs of the day-to-day operations, marketing, promotion, design,

concept, and, as he called it, the "general vibe" of the Philly Rock business.

As to Lori's role, Blatstein's testimony supported the conclusion that she played a very important part in the design, planning, and development of the Philly Rock operation. According to Blatstein, Lori was responsible for (1) choosing the colors for the restaurant's floor; (2) much of the physical work in framing, placement and hanging of the Philly Rock memorabilia which are essential to its atmosphere; (3) tasting and trying different foods for the restaurant; (4) investigating the presentation of different foods in various restaurants for the development of the Philly Rock business; and (5) providing advice and opinions on several of the successful promotional events held at Philly Rock. Quantitatively, Blatstein estimated that, over the four-year period under scrutiny, Lori spent in excess of 500 hours at the Philly Rock business performing these various tasks.

As we noted in *Main IX*, 239 B.R. at 293–94, it is well settled under the laws of this Commonwealth that "a salary must bear a reasonable relation to the officer's ability and to the quantity and quality of the services he [or she] renders." *Ferber v. American Lamp Corp.*, 503 Pa. 489, 495, 469 A.2d 1046, 1049 (1983). *See also* 18B AM.JUR.2d, Corporations, § 1926, at 804–05 (1987 & Supp. 1997); and 8A P.L.E., Corporations, § 265, at 371–75, 377–79 (1973 & Supp.1999). Nevertheless, there is no hard and fast rule to be used in deciding what is reasonable in all cases and each must be decided on its own facts and circumstances. *See Fendelman v. Fenco Handbag Mfg. Co.*, 482 S.W.2d 461, 464 (Mo.1972).

We further stated in *Main IX*, 239 B.R. at 294–95, that

> [a]ctions alleging payment of excessive compensation to corporate insiders always present great difficulties to courts because it is almost impossible to assign a dollar figure to an individual's worth to

a company. There is a great tendency to look only to objective factors like age and hours worked because they help create some objective standards in this uncertain area of the law. Nonetheless, we recognize that intangible factors must be evaluated also. As the Court stated in *Bermann* [*v. Meth*,] ..., 436 Pa. [88,] at 92, 258 A.2d [521,] at 523 [(1069)]:

> "To come within the rule of reason the compensation must be in proportion to the executive's ability, services and time devoted to the company, difficulties involved, responsibilities assumed, success achieved, amounts under jurisdiction, corporation earnings, profits and prosperity, increase in volume or quality of business or both, and all other relevant facts and circumstances. [3A W.] FLETCHER [,CYCLOPEDIA ON THE LAW OF PRIVATE CORP., § 1110,] at 742 (1965)."

*See also,* 12 Summ. PA Jur.2d, Business Relationships, § 8:94, at 531–32 (1993).

In light of these strictures, the testimony of the responsibilities assumed, the difficulties involved in the Philly Rock business, and the success achieved in that business are the factors which are to be considered by the courts in determining the reasonableness of the salaries received. *McEnroy v. Zisler*, 1993 WL 818848 (Mass.Super. Nov. 1, 1993), quoting *Black v. Parker Mfg. Co.*, 329 Mass. 105, 116, 106 N.E.2d 544, 551 (1952). Other intangible factors reviewed by the courts include: (1) the officer's qualifications; (2) the nature, extent and scope of the officer's work; (3) the size and complexities of the business; (4) a comparison of salaries paid with the gross income and the net income; (5) the prevailing general economic conditions; (6) comparisons of salaries with distributions to stockholders; (7) the prevailing rates of compensation for comparable positions in comparable concerns; and (8) in the case of small corporations with a limited number of officers, the amount of compensation paid to a particu-

lar individual in previous years. *Mayson Mfg. Co. v. Commissioner of Internal Revenue*, 178 F.2d 115, 119 (6th Cir.1949). *See also Dexsil Corp. v. Commissioner of Internal Revenue*, 147 F.3d 96, 100 (5th Cir.1997); *Rapco, Inc. v. Commissioner of Internal Revenue*, 85 F.3d 950, 954 (2nd Cir.1996); *Glenmore Distilleries Co. v. Seideman*, 267 F.Supp. 915, 919 (E.D.N.Y. 1967); *Wilderman v. Wilderman*, 315 A.2d 610, 615 (Del.1974); *Goldman v. Jameson*, 290 Ala. 160, 169, 275 So.2d 108, 115–16 (1973); *Mann v. Luke*, 272 A.D. 19, 24–25, 68 N.Y.S.2d 313, 319 (1947); D. Bailey, *Director and Officer Exposure for Executive Compensation*, 657 PLI/Comm 317, 321 (1993); E. Hood & J. Benge, *Golden Parachute Agreements: Reasonable Compensation or Disguised Bribery?*, 53 UMKCL.REV. 199, 223–24 (1985); and A. Rosenbloom, *How to Prove Up an Unreasonable Compensation Case: Methods by Which to Determine Reasonableness*, 60 TAXES 491, 493–96 (1982). Since no single factor is dispositive, the determination of reasonableness is made on an individual basis in light of the facts and circumstances of the particular case involved. *Dexsil, supra*, 147 F.3d at 100; *Rapco, supra*, 85 F.3d at 954; and *Mayson Mfg., supra*, 178 F.2d at 119. *See also* Y. Tauber, *An Introduction to Executive Compensation Planning Techniques and Strategies*, 284 PLI/Tax 7, 13 (1989).

As we indicated in *Main V*, 223 B.R. at 478–79, the facts and circumstances in the instant case show that

the Blatsteins, particularly Eric Blatstein, have put a great deal of time and energy into the operation of Philly Rock and their other corporations. If it were not for the ingenuity as well as the hard work and dedication of Blatstein to Philly Rock, that business would have been unlikely to have been nearly as successful as it has been. It appears that the restaurant has a solid, loyal customer base that continues to patronize Philly Rock even while the neighboring movie theater is under construction, making it difficult for passers-by to ascertain whether Philly Rock is even open for business. We must give credit to Blatstein for creating this customer loyalty. Thus, if we evaluate (1) Blatstein's ability in augmenting Philly Rock's clientele, (2) the difficulties involved in developing the business at hand, (3) the responsibilities and dedication assumed, (4) the time and services devoted to the business' day-to-day operation, (5) the success achieved among its strong customer base, and (6) the earnings, profits, and prosperity realized, we arrive at the same conclusion we reached in *Main V*, *i.e.*, that the Blatsteins did not receive excessive salaries for the work performed by them. All of these conclusions are supported directly by the testimony of Laskaris.

We recognize that Laskaris qualified his testimony when asked whether the compensation rates quoted by him, which he opined as reasonable even if the payments to the Blatsteins totaled $1 million, would still be reasonable even if Philly Rock were insolvent at the time of the payments. However, although we found in *Main IX*, 239 B.R. at 287–88, that the Debtor was in fact insolvent at all times since November 4, 1993, due to the presence of the judgment of 718 Arch Street Associates, Ltd. ("Arch") against it, the nature of this insolvency was "balance sheet, bankruptcy insolvency," not "cash flow insolvency" which impeded the Debtor from running its business and paying its bills, except for the debt to Arch, as they came due. There is no evidence that Blatstein knew or considered the Debtor to be insolvent in any aspects of his operation of Philly Rock.

We also concur with the contention of the Blatsteins that the salaries for the entire four-year can be cumulated in making an appropriate quantitative analysis. In his testimony Laskaris considered the entire four-year time-period together, in rendering his expert opinion that the compensation received by Blatstein was reasonable. Laskaris further stated that, for cash-flow reasons, it was quite common for

owners of restaurants to take uneven compensation out of the business in different years.

Finally, Laskaris testified that the compensation in issue was in consideration for developing the guiding concepts of the establishment and was separate, apart from, and in addition to any management fees payable to a restaurant owner. Thus, the establishment of the reasonable management fees in *Main V* constituted a claim of Blatstein separate from his management fees which did not in any way collaterally estop him from being held to be entitled to the additional compensation at issue. As a result, the Blatsteins will not be directed to make any restoration or repayments of salary compensation received over the four-year period under scrutiny.

2. *The Trustee Only Proved a Liability of $6669.50 on Account of the Blatsteins' Alleged Breaches of Their Fiduciary Duties to the Debtor by Rendering the Debtor Liable for Tax Penalties.*

As we noted at pages 578–79 *supra,* the Trustee contends that, between 1996 and 1998, the Blatsteins neglected to remit withholding taxes and other tax obligations owed by Philly Rock in a timely fashion, resulting in the imposition of certain tax penalties in the amount of $33,256.99 against the Debtor. The District Court, mistakenly assuming that we had withdrawn our holding that the Trustee was responsible for making the payments due for at least some of the taxes and overlooking our finding that the Trustee waived any such claims, *see Main IX,* 239 B.R. at 295–96, merely instructed us to determine whether the Blatsteins violated their fiduciary duties to the Debtor by allowing any such penalties to accrue. *Id.* at 296, citing *Main VIII,* at *21.

Against this background of doubtful support for any legitimate claim in this area, the Trustee has come up with new numbers supported by very weak evidence, *i.e.,* book entries which have no support except

one Notice setting forth an IRS tax penalty of $6669.50 paid by CCO for taxes due for the tax period ending June 30, 1997. *See* pages 578–79 *supra.* We accept Miller's credible testimony that these book entries are inadequate support for claims of compensation of tax penalties which the Trustee has recently discovered for the first time. However, we are prepared to impose the $6669.50 figure as additional liability on the Blatsteins, in light of the District Court's mandate.

■ In finding the Blatsteins liable for this sum, we reject their defense that they made a legitimate business decision to pay other debts and vendors instead of obligations owed to taxing authorities. To support this argument, the Blatsteins cite to a Pennsylvania case formally adopting the "business judgment rule" in this jurisdiction, *Cuker v. Mikalauskas,* 547 Pa. 600, 606–11, 692 A.2d 1042, 1045–47 (1997), and claim that they reasonably believed their conduct to be appropriate under the circumstances. Next, they aver that there has been no bad faith or self-interest alleged in the non-payment of the taxes in question and therefore it would be an error to conclude that a breach of fiduciary duty has been proven on the bare record before us.

■ We reject this argument. The business judgment rule originated as a means of limiting the liability of corporate directors and officers for mistakes made while performing their duties. *Cramer v. General Telephone & Electronics Corp.,* 582 F.2d 259, 274 (3d Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979); *Lewis v. Curtis,* 671 F.2d 779, 786 (3d Cir.1982); *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1175 (Del.1995); and *Kaufman v. Beal,* 1983 WL 20295, at *5 (Del.Ch. Feb. 25, 1983). *See also* D. Block, S. Robin, 4 M. Jaroslawicz, *The Business Judgment Rule in Corporate Restructuring and Recapitalization Transactions,* 660 PLI/Corp 113, 120–24 (1989). Absent bad faith or

some other corrupt motive, directors are normally not liable to their corporation for mistakes of judgment, whether those mistakes are classified as mistakes of fact or mistakes of law. *Briggs v. Spaulding,* 141 U.S. 132, 149, 11 S.Ct. 924, 35 L.Ed. 662 (1891); *Enterra Corporation v. SGS Associates,* 600 F.Supp. 678, 685–86 (E.D.Pa. 1985); and *Selheimer v. Manganese Corp. of America,* 423 Pa. 563, 581, 224 A.2d 634, 644 (1966). *See also* 3A W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS, § 1040, at 50–51 (1991 and 1999 Supp.); and Note, *Protecting Shareholders Against Partial and Two-Tiered Takeovers: The "Poison Pill" Preferred,* 97 HARV.L.REV.1964, 1969 (1984). The rationale for the rule is that in order for a corporation to be managed properly and efficiently, its directors must be given wide latitude in their handling of corporate affairs. *Cramer, supra,* 582 F.2d at 274; *Levin v. Mississippi River Corp.,* 59 F.R.D. 353, 364 (S.D.N.Y.1973), *aff'd mem.,* 486 F.2d 1398 (2nd Cir.1973), *cert. denied,* 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973); and *Cuker, supra,* 547 Pa. at 607, 692 A.2d at 1046. *See also,* 12 Summ.PA Jur.2d, Business Relationships, § 8:60, at 492–93 (1993).

 Notwithstanding, the business judgment rule does not excuse corporate officials from ignoring their tax obligations. That is to say, the rule does not shield nor protect corporate officials from liability for failure to pay federal taxes. We note that 26 U.S.C. §§ 3102(a) and 3402(a) require an employer to deduct and withhold income and social security taxes from the wages paid to its employees. *See United States v. Brennick,* 949 F.Supp. 32, 36 (D.Mass.1996); and *Kinnie v. United States,* 771 F.Supp. 842, 848 (E.D.Mich. 1991). In like manner, 26 U.S.C. § 7501 provides that the withheld taxes shall be retained by the employer as a special trust fund for the benefit of the United States. These trust fund taxes are for the exclusive use of the United States and are not to be used to pay the employer's business

expenses, including salaries, or used for any other purpose. *See Gephart v. United States,* 818 F.2d 469, 472 (6th Cir.1987); *McGlothin v. United States,* 720 F.2d 6, 8 (6th Cir.1983); *Mueller v. Nixon,* 470 F.2d 1348, 1351 (6th Cir.1972), *cert. denied,* 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1001 (1973); *United States v. Gollapudi,* 947 F.Supp. 768, 775 (D.N.J.1996); and *Taubman v. United States,* 499 F.Supp. 1133, 1142 (E.D.Mich.1978). *See also,* M. Bienenstock, *Once in Bankruptcy, Whose Company is It Anyway?,* 573 PLI/Comm 667, 697–98 (1991). In an analogous situation regarding the penalties provided for in 26 U.S.C. § 6672(a), the Sixth Circuit stated that

> [i]t is no excuse that, as a matter of sound business judgment, the money was paid to suppliers and for wages in order to keep the corporation operating as a going concern—the government cannot be made an unwilling partner in a floundering business.

*Collins v. United States,* 848 F.2d 740, 741–42 (6th Cir.1988). *See also Thibodeau v. United States,* 828 F.2d 1499, 1506 (11th Cir.1987); *Lee v. United States,* 951 F.Supp. 79, 83 (W.D.Pa.1997). We also note that, prior to the decision in *Collins,* the District Court in *Wolfe v. United States,* 612 F.Supp. 605 (D.Mont.1985), *aff'd,* 798 F.2d 1241 (9th Cir.1986), found that economic difficulties do not constitute reasonable cause for failure to pay taxes. The District Court stated that

> [a]lmost every non-willful failure to pay taxes is the result of financial difficulties. But to allow businesses to postpone filing returns and paying taxes until economic conditions improve would severely restrict the [Internal Revenue] Service's ability to raise revenue for the operation of the federal government.

612 F.Supp. at 608. *See also In re Upton Printing Co.,* 186 B.R. 904, 906 (Bankr. E.D.La.1995).

 Thus, the Blatsteins' business judgment contentions, at least as to their nonpayment of federal tax liabilities, are

not persuasive in light of the foregoing strictures However, there is a legitimate basis for a refusal to find the Blatsteins liable for any taxes falling due to Philly Rock, at least after we issued *Main II* on September 8, 1997. That is the well-settled principle that the federal withholding provisions of the Internal Revenue Code require that a trustee in bankruptcy perform the duty of withholding income and social security taxes from payments of wage claims. *See Otte v. United States,* 419 U.S. 43, 52, 95 S.Ct. 247, 42 L.Ed.2d 212, (1974). *See also Nicholas v. United States,* 384 U.S. 678, 693, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966); and J. Howard, *An Overview of the State and Federal Tax Responsibilities of Bankruptcy Trustees and Debtors,* 93 COMMERCIAL L.J. 43, 55–56 (1988). In *Otte,* for example, Justice Blackmun opined for a unanimous Court that

> [e]very Court of Appeals which has faced the issue, ... has held, ..., that the withholding provisions of the Internal Revenue Code, and of state or municipal tax statutes, require that a trustee in bankruptcy withhold income and social security taxes from payments of wage claims, and that he prepare and submit to the wage claimants, and to the taxing authorities the reports and returns statutorily required of employers. *United States v. Fogarty,* 164 F.2d 26, 30–33 (C.A.8 1947); *United States v. Curtis,* 178 F.2d 268, 269 (C.A.6 1949), *cert. denied,* 339 U.S. 965, 70 S.Ct. 1001, 94 L.Ed. 1374 (1950); *Lines v. California Dept. of Employment,* (9 Cir.) 242 F.2d 201, 202, *reh. den.,* 246 F.2d 70 (C.A.9), *cert. denied,* 355 U.S. 857, 78 S.Ct. 86, 2 L.Ed.2d 64 (1957); *In re Connecticut Motor Lines, Inc.,* 336 F.2d 96 (C.A.3 1964). To the same effect is *In re Daigle,* 111 F.Supp. 109, 111 (D.Me.1953).

419 U.S. at 48, 95 S.Ct. 247. *See also In re Armadillo Corp.,* 561 F.2d 1382, 1385 (10th Cir.1977). The reason for this is clear. No one other than the person who has control of the payment of the wages is in a position to make the proper accounting and payment to the United States. *In re Laub Baking Co.,* 642 F.2d 196, 198 (6th Cir.1981); *Southwest Restaurant Systems, Inc. v. Internal Revenue Service,* 607 F.2d 1237, 1240 (9th Cir.1979); and *In re Terex Corp.,* 93 B.R. 127, 129 (Bankr.N.D.Ohio 1988).

Therefore, as we held in *Main V,* 223 B.R. at 479–80, it is the Trustee, rather than the Blatsteins, who is the person responsible for the Debtor's taxes and penalties arising from Philly Rock, at least at all times after we held, in *Main II,* that the Trustee was the equitable owner of Philly Rock, *i.e.,* as September 8, 1997. We note, as did the Tenth Circuit in *Armadillo, supra,* 561 F.2d at 1386, that the Trustee has not directed our attention to any authority—statutory, regulatory, or otherwise nor has our independent research disclosed a valid, viable argument for excusing the Trustee from his liability to withhold and pay the wage related taxes relating to the Debtor/Philly Rock, at least at all times after September 8, 1997.

It could legitimately be argued that the Trustee bears the responsibility of filing tax returns for the Debtor, which would include all aspects of Philly Rock's operations, since his appointment on or about December 6, 1996. *See Main I,* 207 B.R. 832, 834 (Bankr.E.D.Pa.1997). However, we also recognize that, as of the date of the Trustee's appointment, Philly Rock was not the property of the Debtor, but of CCO. It was only our decision in *Main II,* as of September 8, 1997, which placed the Trustee in control of Philly Rock.

It is true that, for over two years after September 8, 1997, the Blatsteins continued to operate Philly Rock in light of the order staying enforcement of this agent of the *Main II* and *Main III* decisions. However, as we noted in *Main IX,* 239 B.R. at 295, and becomes obvious when we review the many hours spent by Grossman on behalf of the Trustee reviewing documents relating to Philly Rock's operations

shortly after September 8, 1997, in *Main VIII*, 239 B.R. at 68–69, the Trustee's investigation of same should have put him in touch with all of the information which he needed to prepare the tax returns for 1997 and thereafter.

On the other hand, since we recognize that some of the alleged tax penalties at issue arose in 1996, before the Trustee had control over Philly Rock, we conclude that it would be unfair to hold him in any way responsible for penalties incurred prior to September 8, 1997.

Nevertheless, we find that the Trustee has only proven that tax penalties in the amount of $6669.50 were imposed upon Philly Rock due to the Blatsteins' actions at any time. It is therefore only that sum for which the Blatsteins were proven liable in any event. That penalty was imposed in reference to a tax period prior to September 8, 1997, and therefore we find that it is only that liability for which we find the Blatsteins liable.

We acknowledge that the additional liability of the Blatsteins arising from the issues addressed in this decision is small. This conclusion should be placed in the context of the results in all of the various related decisions at issue. The Trustee has been awarded the apparently valuable Philly Rock establishment. Blatstein has been denied a discharge and Lori has never sought one. In *Main IX*, contrary to the initial decisions of this court, the Trustee, although in our view articulating many of these claims as second thoughts when his initial alter ego theory proved unsuccessful, has been awarded $685,-520.78. Pursuant to the terms of a Consent Order approved on November 30, 1999, the Trustee is to receive payment of $616,968.70 on account of this liability by December 3, 1999. The Trustee has also collected $53,540 from Nondebtor PIER 53 NORTH, INC. ("Pier") and has a $53,000 judgment against Morris Lift. The Trustee hopes to obtain an additional recovery from the Blatsteins as a result of the *Blatstein IV* remand, see pages 579–80 *supra,*

although we are somewhat skeptical as to how that matter may play out.

The *Main IX* award included the $337,-504.35 judgment against Management, which is, in effect, a disgorgement of considerable compensation received by the Blatsteins. The additional sum payable by the Nondebtors, including Pier, of approximately $400,000, represents a substantial and perhaps excessive repayment to the Debtor by the Blatsteins as a consequence of their allowing certain of their corporation to accumulate what they probably assumed at the time were meaningless paper indebtednesses to the Debtor. The payments already made appears to be a quite sufficient penalty for any errors and acceptance of additional compensation on their part.

Regretfully, it appears that a large portion of all of these recoveries will be sought to cover the legal fees necessary to vindicate a refusal of the Trustee's special counsel to seek an earlier compromise, and the apparent free reign given to this outpouring of litigation by the Trustee and his general counsel. Allowing additional recoveries would, in certain instances, result in multiple damages to the Trustee for the same liability and, in our view, effect a penalty which does not fit the putative crime and has become a sop for excessive advocacy. These factors will surely have to be weighed when the fee applications, which were due for services through November 1, 1999, and were filed on November 26, 1999, are decided.

D. *CONCLUSION*

An order allowing the Trustee only a modest recovery of $6669.50 from the Blatsteins for the claims at hand will accordingly be entered.

*ORDER*

AND NOW, this 7th day of December, 1999, after a trial of October 29, 1999, of the issues remaining open in light of our Opinion of September 22, 1999, subsequent

to the District Court's remand of the above-captioned proceeding ("the Proceeding") on October 29, 1999, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of Mitchell Miller, Esquire ("the Trustee") and against ERIC J. BLATSTEIN and LORI J. BLATSTEIN, jointly and severally, in the additional amount of $6669.50.

2. All other claims of the Trustee have either been disposed of prior to this date or are herein DISMISSED, rendering this Order a final disposition of all matters raised in the Proceeding which were outstanding, and allowing this file of the Proceeding to be closed.