**In re Eric J. BLATSTEIN, Debtor.**

**718 Arch Street Associates, Ltd.,
and Michael H. Kaliner,
Trustee, Plaintiffs,**

**v.**

**Eric J. Blatstein, Main, Inc., Lori J. Blatstein, Airbev, Inc., Columbusco, Inc., Delawareco, Inc., Engine 46 Steak House, Inc., Pier 53 North, Inc., Reedco, Inc. and Waterfront Management Corp., Defendants.**

**Bankruptcy No. 96–31813DAS.
Adversary No. 97–0004.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 21, 2000.

Michael H. Kaliner, Fairless Hills, PA, for plaintiff trustee.

Steven M. Coren, Philadelphia, PA, for trustee.

Edward J. DiDonato, DiDonato & Winterhalter, P.C., Philadelphia, PA, for debtor.

Kevin J. Carey, Mesirov Gelman Jaffe, Cramer & Jamieson, Philadelphia, PA, for Lori J. Blatstein.

Mitchell W. Miller, Philadelphia, PA, for trustee, Main, Inc.

Eric L. Frank, Philadelphia, PA, for trustee, Miller.

B. Christopher Lee, Philadelphia, PA, for Jacoby Donner and Corporate, defendants.

Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, PC, Philadelphia, PA, for Main, Inc.

Joel W. Todd, Dolchin, Slotkin & Todd, PC, Philadelphia, PA, for Morris Lift.

W.J. Winterstein, Jr., Philadelphia, PA, for Morris Lift.

Frederic Baker, Ass't U.S. Trustee, Curtis Center, Philadelphia, PA, Joseph Simmons, Clerk, U.S. Bankruptcy Court, Pamela Blalock, Courtroom Deputy Clerk, Jacqueline Campbell–Harrison, Deputy Clerk.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Barring reversals and/or remands of this decision or of our last previous so-called "Supplemental Opinion" presently only reported as *In re Main, Inc.*, 242 B.R. 574 (Bankr.E.D.Pa.1999) (*"Main X"*), this may be the last in our long series of decisions arising out of the related Chapter 7 bankruptcy cases of Main, Inc. ("Main"), formerly the owner of the Philly Rock Bar and Grill ("Philly Rock"), and its principal, Eric J. Blatstein ("Blatstein"). The entire sequence is recited in our immediate prior decisions of September 22, 1999, and September 17, 1999, appearing at 239 B.R. 281, 284–85 (*"Main VIII"*) and 239 B.R. 59, 62–67 (*"Main IX"*). This will reflect the end of a significant body of legal and judicial work, much of which the subject matter would not appear to justify, but is necessary because of the inability of the parties to settle virtually any aspects of their disputes.

The instant Opinion addresses basically one legal issue: the proper remedy when a husband is found to have engaged in actual fraud by conveying his income, all of which has now apparently been spent at his direction, to his wife. We find, in the instant circumstances, where the wife has not been found to engage in any fraud, the

only appropriate remedy is a judgment against the husband for the amount conveyed, as opposed to a judgment against the wife or against the husband/wife entireties entity, jointly and severally, for this amount. We also herein determine that the amount of the income transferred which is property of Blatstein's bankruptcy estate is $1,533,428.65, and we therefore proceed to enter judgment in favor of the Trustee and against Blatstein only in that amount.

## B. *PROCEDURAL AND FACTUAL HISTORY*

On September 3, 1999, the Third Circuit Court of Appeals ("the Ct.App.") in an Opinion reported as *In re Blatstein,* 192 F.3d 88 (3rd Cir.1999) (*"Blatstein IV"*),[1] affirmed in part and reversed in part a decision issued by the United States District Court for the Eastern District of Pennsylvania ("the Dist.Ct.") on September 23, 1998, reported at 226 B.R. 140 (*"Blatstein II"*). In so doing, *Blatstein IV* upheld our previous findings in *In re Main Inc.,* 213 B.R. 67, (*"Main II"*), *modified in part,* 1997 WL 626544 (Bankr.E.D.Pa. Oct. 7, 1997) (*"Main III"*), *aff'd in part & rev'd & remanded in part sub nom. Blatstein II, reinstated as to issues remanded,* 1998 WL 778017 (Bankr.E.D.Pa. Nov. 4, 1998) (*"Main IV"*), *aff'd as to issues remanded,* 1999 WL 689715 (E.D.Pa. Sept. 3, 1999) (*"Blatstein III"*), *Blatstein II aff'd. in part and rev'd in part as to issues not remanded, Blatstein IV,* that Blatstein did not fraudulently transfer shares of corporations owned with his wife, LORI J. BLATSTEIN ("Lori," with Blatstein, "the Blatsteins"), to Lori because these shares were at all times already in Lori's name. 192 F.3d at 96. Similarly, the Ct.App. affirmed our prior refusal in *Main II* to engage in "reverse piercing" of the corporate veils of the Blatsteins' corporate entities. *Id.* at 101, referencing *Main II,* 213 B.R. at 89–90.

Nonetheless, *Blatstein IV* disapproved the portion of our analyses and findings in *Main II* and *Main III* that dealt with Blatstein's earned income transfers into Lori's Mellon PSFS and Gruntal Money Market accounts. The Ct.App. critique of our conclusions on this point were as follows, 192 F.3d at 97–98:

> We reject … the bankruptcy court's conclusions with respect to Blatstein's income transfers to Lori's personal bank accounts. Unquestionably, Lori would have been entitled to dividends from the corporations. So we would uphold transfers of that nature. But the bankruptcy court held that [Blatstein's] income checks constituted income of that character because the checks "were not the same as paychecks from a third-party employer," but instead "could be viewed as distributions of dividends or equity from the corporations …" *Main III,* 1997 WL 626544, at *6 (emphasis added).

> We reject this conclusion. First, the payments were made by the corporations only to Blatstein and not to [Lori]. Furthermore, the form of payments reflected reality as Blatstein undoubtedly operated the business. In fact, as Arch Street pointed out in its brief and again at oral argument, Blatstein treated his paychecks as wages or Schedule C sole-proprietorship income on his tax returns and not as dividends or distributions to a shareholder. Br. at 45. Likewise, the corporations treated the payments as wages or commissions and not as distributions to a shareholder.

> …

> Our conclusion that Blatstein's income was earned income leads us to consider the bankruptcy court's finding that he deposited his income into Lori's accounts because his credit and reputation with banks was poor, and because he

---

1. For the sake of uniformity, we have retained all of the designations of the various prior Opinions which appear in *Main X* even though many of the prior decisions are not themselves referenced herein.

"was trying to keep the funds from being seized or frozen by the IRS or other taxing authorities, pursuant to a tax lien, in light of the personal income taxes which he owed to the IRS." *Main II,* 213 B.R. at 94. The bankruptcy court further noted that "taxes were paid from [the Gruntal] Account, and therefore no fraud on the IRS or other taxing authorities appears to have been effected." *Id.* These findings are significant because, notwithstanding the bankruptcy court's contrary conclusion, they clearly demonstrate that despite the payment of some taxes, Blatstein intended to defraud the Internal Revenue Service, one of his creditors.

Accordingly, the Ct.App. remanded the case to the Dist.Ct. for further proceedings consistent with its Opinion. On October 15, 1999, the Dist.Ct. in turn remanded the matter to us for further proceedings consistent with *Blatstein IV.*

Pursuant thereto, we entered, as part of an Order on November 1, 1999, which also set forth the briefing schedule in *Main X,* a directive to the parties to simultaneously submit opening briefs by December 17, 1999, and reply briefs by December 31, 1999, addressing these remanded issues. Both parties complied with these deadlines in rendering their respective submissions.

In his opening brief the trustee of Blatstein's case, Michael J. Kaliner ("the Trustee"), by his special counsel who is also special counsel to Trustee Miller in the *Main* case, argued that Blatstein fraudulently transferred in excess of $3.2 million to Lori between 1994 and 1997. The Trustee maintained that judgment should be entered against the Blatsteins, jointly and severally, in this amount, plus interest. Finally, he contended that he is entitled to equitable remedies, apparently an injunction to prevent that Blatsteins from any further dispositions and encumbrances of their assets until his judgment was satisfied.

The Blatsteins, on the other hand, asserted that no deposits were made into accounts of Lori prior to October 3, 1995, and therefore the income of Blatstein prior to October 3, 1995, should not be considered by this court. In addition, they claim that applicable limitations bars claims based on earlier income. They also claimed that any transfers on or after December 16, 1996, should not be considered by this court, as same were not property of the Trustee's estate. The Blatsteins further maintained that no judgment should be entered against Lori. Finally, they averred that the Trustee is not entitled, in any event, to a joint and several judgment against them, nor to any equitable relief.

In fulfilling our duty to respond to the specific mandate outlined by the Ct.App. in *Blatstein IV,* we must first ascertain (1) the applicable time-frame for which the monies transferred by Blatstein to Lori may be set aside; and (2) what sums Blatstein actually transferred to Lori during the applicable time-frame.

In his brief, the Trustee argued that between 1994 and 1997 Blatstein earned $3,246,335.70 and fraudulently transferred these entire sums into Lori's possession. According to the Trustee, in the year 1994 alone Blatstein received a total dollar amount of $395,365.91 in income which was transferred to Lori. This total amount claimed by the Trustee is broken down by us in TABLE 1 below as follows:

TABLE 1
1994 EARNED INCOME MONIES TRANSFERRED BY BLATSTEIN AS CLAIMED BY THE TRUSTEE

| NATURE OF EARNED INCOME MONIES RECEIVED | DOLLAR AMOUNT |
|---|---|
| 1. W–2 wage | $ 26,300.00 |
| 2. Schedule C sole proprietorship income<br>Delawareco — $105,124<br>Main — $ 26,817<br>Pier 53 — $ 65,000 | $196,941.00 |
| 3. Pier 53 | $140,000.00 |
| 4. Checks not recorded on Main's general ledger | $ 15,024.91 |
| 5. Cash payouts not recorded on Main's books | $ 17,100.00 |
| **TOTAL DOLLAR AMOUNT TRANSFERRED** | $395,365.91 |

Next, the Trustee maintained that, for 1995, Blatstein's total amount of income consisted of $1,222,588.79, all of which was transferred to Lori. This total amount is broken down by us in TABLE 2 as follows:

**TABLE 2**
**1995 EARNED INCOME MONIES TRANSFERRED BY BLATSTEIN AS CLAIMED BY THE TRUSTEE**

| NATURE OF EARNED INCOME MONIES RECEIVED | DOLLAR AMOUNT |
|---|---|
| 1. W–2 wages<br> Main — $146,900<br> Delawareco — $146,900 | $ 293,800.00 |
| 2. Schedule C sole proprietorship income<br> Main — $195,302 | $ 195,302.00 |
| 3. Unreported management fees paid by Delawareco | $ 8,600.00 |
| 4. Unreported management fees paid by Engine 46 | $ 13,349.00 |
| 5. Monies transferred to the Gruntal Money Market Account | $ 711,537.79 |
| TOTAL DOLLAR AMOUNT TRANSFERRED | $1,222,588.79 |

Next, the Trustee contended that, for the year 1996, Blatstein's earned income monies totaled $971,829.00. According to the Trustee, Blatstein placed the overwhelming majority of these monies into the Gruntal Money Market account, and put other funds into Lori's Mellon PSFS account. This total amount claimed is broken down in TABLE 3 by us as follows:

**TABLE 3**
**1996 EARNED INCOME MONIES TRANSFERRED BY BLATSTEIN AS CLAIMED BY THE TRUSTEE**

| NATURE OF EARNED INCOME MONIES RECEIVED | DOLLAR AMOUNT |
|---|---|
| 1. W–2 wages<br> Waterfront — $558,288 | $558,288.00 |
| 2. Schedule C sole proprietorship income | $413,541.00 |
| TOTAL DOLLAR AMOUNT TRANSFERRED | $971,829.00 |

Finally, the Trustee noted that, in 1997, Blatstein received a total amount of $656,-552.00 in income, all of which was transferred into Lori's Mellon PSFS and Gruntal Money Market accounts. This amount is broken down again as follows in TABLE 4 below:

**TABLE 4**
**1997 EARNED INCOME MONIES TRANSFERRED BY BLATSTEIN AS CLAIMED BY THE TRUSTEE**

| NATURE OF EARNED INCOME MONIES RECEIVED | DOLLAR AMOUNT |
|---|---|
| 1. W–2 wages<br> Waterfront — $306,552 | $306,552.00 |
| 2. Schedule C sole proprietorship income | $350,000.00 |
| TOTAL DOLLAR AMOUNT TRANSFERRED | $656,552.00 |

To support these arguments and figures, the Trustee relied solely on (1) Blatstein's income tax returns and schedules for the years under scrutiny; (2) the Trustee's Report utilized by Trustee Miller in *Main X. See* 242 B.R. 574, 577–85; (3) reports of the transactions in Lori's Gruntal Money Market account from October 3, 1995, through February 29, 1999; (4) reports of the transactions in Lori's Mellon PSFS account from November 11, 1995 through January 31, 1997; and (5) evidence and testimony adduced by Trustee Miller in this and the related adversary proceedings.

In making these arguments and supporting his dollar figures, the Trustee contended that he is entitled to a judgment equal to Blatstein's total income and not merely the latter's paychecks deposited in Lori's accounts in and after October 1995. In support of this argument, the Trustee observed that, from December 1992 through December 1996, Blatstein transferred his total income (earned income paychecks, sole proprietorship income, and commissions) to Lori. He relied on the *Blatstein IV* holding to claim that we must enter a judgment in his favor equal to Blatstein's total income, regardless of whether Lori deposited it in her accounts. In a similar manner, the Trustee contended that he is also entitled to a judgment for Blatstein's post-petition transfers. To support this contention, the Trustee noted that (1) 12 Pa.C.S. § 5104 of the Pennsylvania Uniform Fraudulent Transfer Act (PUFTA) entitled them to pursue and recover Blatstein's fraudulent transfers made after Blatstein filed for bankruptcy; and (2) because Blatstein was denied a

discharge, his claims against the Blatsteins under the PUFTA should extend past his bankruptcy filing.

The Blatsteins, on the other hand, contended that we can only consider the amounts transferred by Blatstein into Lori's Mellon PSFS and Gruntal Money Market accounts during the four-year period under scrutiny. According to the Blatsteins, for 1994, the monies transferred by Blatstein into Lori's Mellon PSFS account was not $395,365.91, as alleged by the Trustee, but nothing, as the account was not yet opened. The Blatsteins thus rely on the fact that, in 1994, neither of the Blatsteins, including Lori, maintained any bank accounts due to Blatstein's financial difficulties.

Next, the Blatsteins observed that, in 1995, the income transferred by Blatstein into Lori's personal accounts was not $1,222,588.79, but $12,800.00. This total dollar amount itemized by the Blatsteins is set down by us in TABLE 5 as follows:

**TABLE 5**
**1995 EARNED INCOME MONIES TRANSFERRED BY BLATSTEIN AS CLAIMED BY THE BLATSTEINS**

| NATURE OF EARNED INCOME MONIES RECEIVED | DOLLAR AMOUNT |
|---|---|
| 1. Monies transferred to the Mellon PSFS account | $12,800.00 |
| 2. Monies transferred to the Gruntal Money Market account | $ 0.00 |
| **TOTAL DOLLAR AMOUNT TRANSFERRED** | $12,800.00 |

The Blatsteins further argued that, for 1996, the earned income monies transferred by Blatstein into Lori's personal accounts was $296,598.95, instead of the $971,829.00 claimed by the Trustee. The amount claimed by the Blatsteins is itemized by us in TABLE 6 as follows:

**TABLE 6**
**1996 EARNED INCOME MONIES TRANSFERRED BY BLATSTEIN AS CLAIMED BY THE BLATSTEINS**

| NATURE OF EARNED INCOME MONIES RECEIVED | DOLLAR AMOUNT |
|---|---|
| 1. Monies transferred to the Mellon PSFS account | $177,588.43 |
| 2. Monies transferred to the Gruntal Money Market account | $119,010.52 |
| **TOTAL DOLLAR AMOUNT TRANSFERRED** | $296,598.95 |

Next, the Blatsteins asserted that, for 1997, the income transferred amounted to $6,038.42, not $656,552.00, as claimed by the Trustee. The amount was itemized by the Blatsteins is reflected by us as follows in TABLE 7 below:

**TABLE 7**
**1997 EARNED INCOME MONIES TRANSFERRED BY BLATSTEIN AS CLAIMED BY THE BLATSTEINS**

| NATURE OF EARNED INCOME MONIES RECEIVED | DOLLAR AMOUNT |
|---|---|
| 1. Monies transferred to the Mellon PSFS account | $6,038.42 |
| 2. Monies transferred to the Gruntal Money Market account | $ 0.00 |
| **TOTAL DOLLAR AMOUNT TRANSFERRED** | $6,038.42 |

In addition to these arguments and lowered dollar amount figures, the Blatsteins argued that we should not consider evidence of any transfers prior to October 3, 1995. They claimed that the Trustee offered no evidence of income transfers into Lori's accounts predating that date. Alternatively, the Blatsteins averred that, even if the Trustee could point to any such other evidence in the record, the statute of limitations under the PUFTA reaches back only to transfers occurring on or after February 1, 1994, citing 12 Pa.C.S. § 5109. Furthermore, the Blatsteins maintained that any earned income received by Blatstein after the filing date is not property of his estate recoverable by the Trustee. In support of this argument, the Blatsteins rely on 11 U.S.C. § 541. Further, they observed that no intent to defraud any creditor after the filing date was ever introduced by the Trustee at trial.

## C. DISCUSSION

### 1. The Trustee's Claims After February 1, 1994, Are Not Barred by Limitations, But There Is No Evidence of Transfers of Income by Blatstein to Lori Prior to October 3, 1995.

We believe that the Trustee's position that his claims stretching back to 1994 for monies fraudulently transferred are not barred by limitations is correct. A trustee's power to avoid transfers of an interest of the debtor in property that an unsecured creditor could avoid under the PUFTA is provided by 11 U.S.C. § 544(b), which reads in pertinent part as follows:

(b)(1) ... the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title ...

■ If the applicable non-bankruptcy law statute of limitations has not expired prior to the filing of a bankruptcy petition, a trustee may bring an avoidance action under the powers bestowed upon the trustee by § 544(b) within the time-frame imposed by 11 U.S.C. § 546(a). *In re Ambulatory Medical & Surgical Health Care, Inc.,* 187 B.R. 888, 901 (Bankr.W.D.Pa. 1995); *In re Sverica Acquisition Corp.,* 179 B.R. 457, 466 (Bankr.E.D.Pa.1995); *In re Topcor, Inc.,* 132 B.R. 119, 123–24 (Bankr.N.D.Tex.1991). *See also* 4 COLLIER ON BANKRUPTCY, ¶ 544.03[2], at 544–22 to 544–23 (15th ed. rev.1999). Section 546 merely provides that an action must be brought within two years after the appointment of a trustee, which clearly is satisfied here.

Thus, the only limitation which could bar the Trustee's claims arises from PUFTA's four-year statute of limitations. 12 Pa.C.S. § 5109(2). We find that most of the prepetition transactions referenced by the Trustee were within the limitations period as of the date that Blatstein's bankruptcy petition was filed. *Compare Main X,* 242 B.R. 574, 583–84 (claims as which limitations had already expired as of the date of the filing of the petition were barred).

■ Despite these findings, we further note that limitations would bar any claims prior to February 1, 1994. Our reasoning for this conclusion arises from the fact that Pennsylvania adopted PUFTA effective February 1, 1994. *See In re Meinen,* 232 B.R. 827, 840 (Bankr.W.D.Pa. 1999); and R. Ridge & E. McGlone, *A Practitioner's Guide to Pennsylvania's Newly Adopted Uniform Fraudulent Transfer Act,* 99 DICK.L.REV. 117 (1994). Prior to that date, the state law which related to fraudulent conveyances was the Pennsylvania Uniform Fraudulent Conveyance Act, which had a statute of limitations of only two years. 42 Pa.C.S. § 5524(3); *In re Frascatore,* 98 B.R. 710, 718 (Bankr. E.D.Pa.1989); and *In re Penn Packing Co.,* 42 B.R. 502, 505 (Bankr.E.D.Pa.1984). PUFTA does not specifically address whether it is to be applied retroactively, but the normative rule regarding the effect of statutes is that they are applied prospectively only. *Cf. In re Fleet,* 122 B.R. 910, 915 (Bankr.E.D.Pa.1990) (addressing New Jersey's enactment of a law comparable to PUFTA).

■ However, this discussion of limitations becomes largely academic when we focus upon precisely what earned income Blatstein was held by the Ct.App. in *Blatstein IV* to have fraudulently transferred. The only sums referenced are amounts transferred by him into "Lori's personal bank accounts." 192 F.3d at 96–97. The only such accounts were Lori's Mellon PSFS and Gruntal Money Market accounts. The Trustee contended that he was entitled to a judgment equal to Blatstein's total income from the beginning of the applicable limitations period, which we hold is February 1, 1994, forward, and not merely on account of Blatstein's income transferred into Lori's personal bank accounts.

We find no merit in this position. In *Blatstein IV,* the Ct.App. plainly stated that it was ruling only that Blatstein acted with intent to defraud his creditors when he transferred his earned income into Lori's bank accounts. 192 F.3d at 97. At no time did *Blatstein IV* suggest, or even infer, that the Trustee would be entitled to a judgment referencing Blatstein's total income for any applicable period. To the contrary, *Blatstein IV* held only that, by transferring earned income paychecks into Lori's personal bank accounts, Blatstein defrauded his creditors. *Id.* at 88. As a result, only the transfer of Blatstein's earned income which was transferred into Lori's account was found by the Ct.App. to constitute a fraudulent conveyance in contravention to PUFTA. These deposits did not commence until the earliest of the accounts was opened and the first deposits were made on October 3, 1995. The time-period for which we must calculate of the income fraudulently transferred by Blatstein to Lori therefore cannot pre-date October 3, 1995.

2. *The Trustee Cannot Recover Blatstein's Post–Petition Income Deposits Because Such Funds Are Not Property of His Estate.*

The Trustee argued that he is entitled to recover post-petition income of Blatstein transferred to Lori after his Chapter 7 bankruptcy filing on December 19, 1996, calculating funds so transferred into 1997. The Blatsteins, however, point out that post-petition earnings of Blatstein are not property of his estate. *See* 11 U.S.C. §§ 541(a)(1), (a)(6); *Turner v. Avery,* 947 F.2d 772, 774 (5th Cir.1991); *In re Weisberg,* 218 B.R. 740, 751–52 (Bankr.E.D.Pa. 1998): and 5 COLLIER, *supra,* ¶ 541.17, at 541–67. The Trustee countered by arguing that the Trustee was among the creditors defrauded by Blatstein and, as the estate's representative of all of his creditors, he should be accorded a priority over individual creditors in pursuing Blatstein's post-petition earnings.

In making these arguments, we believe that the Trustee has confused his rights against Blatstein with his remedies for actions taken which were violative of his rights. At this point, we are measuring his rights. In so doing, we can only accord the Trustee rights in response to Blatstein's fraudulent transfer of property of his estate. The arguments made by the Trustee address only potential measures by the Trustee to enforce his rights after these rights are established.

We also note that the Trustee's power to invoke PUFTA under 11 U.S.C. § 544 is limited, by § 544(a), to the rights of hypothetical creditors "as of the commencement of the case." Numerous cases have held that, since a trustee's § 544(b) rights are subject to the limitations set forth in § 544(a), post-petition transfers in violation of state law cannot be reached by a Chapter 7 trustee. *See In re Centennial Textiles, Inc.,* 227 B.R. 606, 610 (Bankr. S.D.N.Y.1998); *In re Mushroom Transportation Co.,* 227 B.R. 244, 259–60 (Bankr.E.D.Pa.1998); *In re Metropolitan Cosmetic Reconstructive Surgery, P.A.,* 125 B.R. 556, 557 (Bankr.D.Minn.1991); and *In re Sattler's, Inc.,* 73 B.R. 780, 790 (Bankr.S.D.N.Y.1987).

As a result, we conclude that it is only income earned by Blatstein which was transferred into Lori's accounts after they were opened on October 3, 1995, through the filing of Blatstein's bankruptcy case on December 16, 1996, which the Trustee may recover. We will now turn to computing precisely what earned income Blatstein actually transferred into Lori's Mellon PSFS and Gruntal Money Market accounts during this period.

3. *Blatstein Transferred $1,533,428.65 Into Lori's Accounts During the Pertinent Period.*

We note that the computations of the amounts which *Blatstein IV* held were fraudulently conveyed are computed very differently by the parties in their respective briefs. We find that the Trustee's brief offered grossly inflated numbers.

Some of the dollar figures presented by the Trustee were already discarded by us in the *Main X* opinion, *see, e.g.,* 242 B.R. 574, 582–85, while others were not reflective of any type of transfer. Moreover, they greatly exceed the $2 million figure for which the Trustee sought judgment from the Dist. Ct., prior to the remand to this court. We are therefore presented again with an ever-upward moving target of amounts claimed by the Trustees from the Blatsteins. *Compare Main X,* 242 B.R. at 578.

The calculations in the Blatsteins' brief, on the other hand, we find to be no more accurate than those of the Trustee. The Blatsteins not only present highly deflated numbers, but also they fail to show all of the actual transactions at issue.

Our rigorous analysis of the evidence submitted reveals that Blatstein transferred a total dollar amount of $1,533,-428.65 into Lori's Mellon PSFS and Gruntal Money Market accounts between October 3, 1995, and December 19, 1996. Our study of the pertinent records shows that, between November 24, 1995, and December 22, 1995, there were eight (8) deposits made into Lori's Mellon PSFS account for a total dollar amount of $15,-478.26. The record also reflects that, between October 3, 1995, and December 29, 1995, a total of twelve (12) deposits were made into Lori's Gruntal Money Market account for a dollar value of $711,537.79. These transactions are itemized in TABLE 8 below as follows:

TABLE 8
1995 EARNED INCOME MONIES TRANSFERRED BY BLATSTEIN

| TRANSACTION DATE | MELLON PSFS | TRANSACTION DATE | GRUNTAL MONEY MARKET |
|---|---|---|---|
| 11/24/95 | $ 150.00 | 10/03/95 | $500,000.00 |
| 11/30/95 | $ 100.00 | 10/06/95 | $ 5,500.00 |
| 12/04/95 | $ 388.00 | 10/17/95 | $ 8,570.00 |
| 12/06/95 | $ 4,100.00 | 10/27/95 | $ 2,000.00 |
| 12/18/95 | $ 800.00 | 10/31/95 | $ 4,500.00 |
| 12/18/95 | $ 8,700.00 | 11/06/95 | $ 3,700.00 |
| 12/21/95 | $ 340.26 | 11/16/95 | $ 1,400.00 |
| 12/22/95 | $ 900.00 | 11/20/95 | $ 71,667.79 |
| | | 11/28/95 | $ 4,200.00 |
| | | 12/18/95 | $ 8,300.00 |
| | | 12/27/95 | $100,000.00 |
| | | 12/29/95 | $ 1,700.00 |
| TOTAL | $15,478.26 | TOTAL | $711,537.79 |
| TOTAL DOLLAR AMOUNT | | | $727,016.05 |

Further, we find that between January 2, 1996, and December 13, 1996, a total of thirty-three (33) deposits were made into Lori's Mellon PSFS account by Blatstein, for a total figure of $174,192.73. The record further shows that between January 4, 1996, through December 2, 1996, there were thirty-three (33) deposits into Lori's Gruntal Money Market account, a total of $632,219.87. These transactions are itemized as follows:

TABLE 9
1996 EARNED INCOME MONIES TRANSFERRED BY BLATSTEIN

| TRANSACTION DATE | MELLON PSFS | TRANSACTION DATE | GRUNTAL MONEY MARKET |
|---|---|---|---|
| 01/02/96 | $ 400.00 | 01/04/96 | $200,000.00 |

| TRANSACTION DATE | MELLON PSFS | TRANSACTION DATE | GRUNTAL MONEY MARKET |
|---|---|---|---|
| 01/02/96 | $ 5,800.00 | 01/16/96 | $ 3,500.00 |
| 01/16/96 | $ 8,700.00 | 01/16/96 | $ 25,000.00 |
| 01/18/96 | $ 1,300.00 | 01/22/96 | $ 500.00 |
| 01/20/96 | $ 4,260.00 | 01/25/96 | $100,000.00 |
| 01/29/96 | $ 5,001.06 | 02/01/96 | $ 550.00 |
| 02/05/96 | $ 5,054.75 | 02/07/96 | $ 2,840.00 |
| 02/15/96 | $ 5,021.27 | 02/20/96 | $ 7,400.00 |
| 02/17/96 | $ 5,560.67 | 02/28/96 | $ 2,500.00 |
| 02/24/96 | $ 5,670.16 | 03/09/96 | $ 3,800.00 |
| 03/01/96 | $ 5,681.53 | 03/11/96 | $ 80,600.00 |
| 03/11/96 | $ 5,627.84 | 03/15/96 | $ 20,627.84 |
| 03/25/96 | $ 5,593.84 | 03/25/96 | $ 65,000.00 |
| 04/08/96 | $ 5,593.84 | 03/29/96 | $ 500.00 |
| 04/19/96 | $ 5,593.84 | 03/29/96 | $ 5,593.84 |
| 05/03/96 | $ 5,593.84 | 04/12/96 | $ 5,593.84 |
| 05/13/96 | $ 5,593.84 | 04/30/96 | $ 5,593.84 |
| 05/28/96 | $ 5,593.84 | 05/16/96 | $ 5,593.84 |
| 06/07/96 | $ 5,647.53 | 05/31/96 | $ 5,593.84 |
| 06/07/96 | $ 500.00 | 06/14/96 | $ 5,593.84 |
| 06/20/96 | $ 5,593.84 | 06/28/96 | $ 5,593.84 |
| 07/08/96 | $ 5,595.67 | 07/02/96 | $ 5,493.49 |
| 07/19/96 | $ 5,595.67 | 07/15/96 | $ 5,595.67 |
| 07/29/96 | $ 5,595.67 | 09/02/96 | $ 5,000.00 |
| 08/09/96 | $ 5,595.67 | 09/05/96 | $ 5,595.67 |
| 09/09/96 | $ 5,595.67 | 09/05/96 | $ 5,595.67 |
| 09/13/96 | $ 5,595.67 | 09/27/96 | $ 5,595.67 |
| 09/24/96 | $ 5,595.67 | 10/18/96 | $ 8,040.73 |
| 10/07/96 | $ 5,595.67 | 10/28/96 | $ 8,436.64 |
| 10/15/96 | $ 5,595.67 | 10/28/96 | $510,441.66 |
| 11/13/96 | $ 6,816.67 | 11/15/96 | $ 6,816.64 |
| 11/26/96 | $ 6,816.67 | 11/15/96 | $ 6,816.64 |
| 12/13/96 | $ 6,816.67 | 12/02/96 | $ 6,816.67 |
| TOTAL | $174,192.73 | TOTAL | $632,219.87 |
| **TOTAL DOLLAR AMOUNT** | | **$806,412.60** | |

We therefore find that the total amount fraudulently conveyed to Lori by Blatstein amounted to $1,533,428.65.

4. *The Trustee Is Entitled to a Judgment Against Blatstein Only for This Sum of $1,533,428.65.*

We next pass on to determine (1) whether a judgment should be entered against Lori for the income fraudulently received by her in her accounts; (2) whether judgment should be entered, jointly and severally, against the Blat- steins; and (3) whether further equitable remedies are warranted.

The Trustee contended that judgment should be entered against Lori for the income received. In support of this contention, the Trustee relied on the remedial provisions embodied in 12 Pa.C.S. § 5108(b) of PUFTA. Next, the Trustee maintained that he was also entitled to a judgment against Blatstein himself for the income Blatstein fraudulently transferred to his wife, citing, *e.g., Rupp v. Markgraf,* 95 F.3d 936, 941 (10th Cir.1996); and

*Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890, 893 (7th Cir.1988).

Further, the Trustee vigorously asserted that judgment should be entered, jointly and severally, against the Blatsteins. To support this assertion, the Trustee argued mainly that "equity and justice" required such a judgment because a judgment against only one or the other of Blatstein and Lori would be difficult to collect. The request for a judgment against Lori was based on 11 U.S.C. § 550. The request for a joint judgment was based upon, citations to, *inter alia, Elliott v. Kiesewetter,* 98 F.3d 47, 56–57 (3rd Cir.1996); *First National Bank of Marietta v. Hoffines,* 429 Pa. 109, 117, 239 A.2d 458, 463–64 (1968); *Taylor v. Kaufhold,* 379 Pa. 191, 195–96, 108 A.2d 713, 715–16 (1954); *Coscia v. Hendrie,* 427 Pa.Super. 585, 590, 629 A.2d 1024, 1026 (1993); and *Garden State Standardbred Sales Co. v. Seese,* 417 Pa.Super. 15, 23, 611 A.2d 1239, 1243 (1992).

Further, the Trustee averred that he was entitled to equitable remedies to aid his collection efforts. In support of this position, the Trustee cited 12 Pa.C.S. § 5107(a), under which PUFTA grants a court equitable power to enjoin the further transfers, dispositions, or encumbrances of fraudulently-conveyed assets. Finally, the Trustee concluded that the Blatsteins are liable for interest on the money they fraudulently transferred, citing *Rizzo v. Haines,* 520 Pa. 484, 509–10, 555 A.2d 58, 70 (1989).

The Blatsteins countered that judgment should not be entered against Lori. In support of this contention, the Blatsteins note that Lori has no liability to the Trustee under the PUFTA and cite 12 Pa.C.S. §§ 5104, 5108(b)(1); and *In re Foxcroft Square Co.,* 184 B.R. 671, 674 (E.D.Pa. 1995). Next, they argued that the Trustee was not entitled, in any event, to a joint and several judgment against them.

In support of this argument, the Blatsteins correctly observed that the Trustee was unable to locate any authority which would impose joint and several liability on the transferor and transferee of a fraudulent conveyance. They noted that cases cited by the Trustee involved fraudulent transfers from a spouse into an entireties entity for the purpose of thereby rendering collection of a judgment more difficult. Although in many of these cases, the fraud was found to have been perpetrated by only one individual spouse, the transferee was the entireties entity, which is not the case here.

Further, the Blatsteins maintained that the Trustee was not entitled to equitable remedies. The Blatsteins claimed that the only offending actions found to be fraudulent by *Blatstein IV* involved the transfer of monies, which can be remedied by a money judgment against the appropriate liable party. Finally, the Blatsteins concluded that the Trustee was not entitled to prejudgment interest on any judgment, observing that the *Rizzo* case cited in support of this claim involved a very distinct legal malpractice claim.

■ We find that the Blatsteins' position with respect to Lori's liability is correct on these facts. Section 550(a) of the Code governs a trustee's recovery of a fraudulent conveyance. It provides in relevant part as follows:

**§ 550. Liability of transferee of avoided transfer**

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made ...

In the instant case, it is undisputable that the income at issue were transferred into Lori's personal bank accounts. How-

ever, in order for Lori to be liable under § 544(b) of the Bankruptcy Code and §§ 5104, 5108(b) of PUFTA for these fraudulent conveyances, she must be found to be an "initial transferee" of the property conveyed under § 550(a)(1). We find that she is not. As noted by the Ct.App. in *Blatstein*, 192 F.3d at 98,

> by failing to place the burden on Lori to prove that she gave reasonable consideration, the [bankruptcy] court did not adopt the more plausible interpretation of the facts: *that Blatstein retained control over the funds despite transferring them to his wife.* Lori ... used the funds both for her benefit and that of her husband for such purposes as paying their joint debts and putting aside money for their children's college educations. These payments suggest that Blatstein's conveyances were *in title only,* and that instead of giving her husband consideration in the form of payments of his debts, Lori merely was using the money where Blatstein *directed her* to use it. (emphasis added).

■ In *Bonded, supra,* a bank received a check, payable to the bank's order, with a note directing the bank to deposit the check into a customer's account. The funds were eventually used to pay off the outstanding balance on the customer's loan from the bank. The trustee claimed the bank was the initial transferee of the funds because it was the payee of the check. The *Bonded* court, however, held that the bank was not the initial transferee, but became a transferee only when the account was debited to pay off the loan. As noted by the court in *Bonded,* 838 F.2d at 893,

> [a]lthough the Bankruptcy Code does not define "transferee," and there is no legislative history on the point, we think the minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the "initial transferee;" the agent may be disregarded. The perspective

had impressive support under the 1898 Code, *e.g., Mayo v. Pioneer Bank & Trust Co.,* 270 F.2d 823, 830 (5th Cir. 1959) (disregarding corporate forms in order to identify the entity with control over the assets), and has been employed under the 1978 Code as well, *e.g., In re Colombian Coffee Co.,* 75 B.R. 177, 178–79 (S.D.Fla.1987), *affirming* 64 B.R. 585 (Bankr.S.D.Fla.1986). *See also, In re Auto–Pak, Inc.,* 73 B.R. 52 (D.D.C.1987) (treating the IRS as a mediate rather than initial transferee when the money is washed through a second corporation's account); *In re Jorges Carpet Mills, Inc.,* 50 B.R. 84 (Bankr.E.D.Tenn. 1985) (similar).

*See also* G. Smith & F. Kennedy, *Fraudulent Transfers and Obligations: Issues of Current Interest,* 43 S.C.L.REV. 709, 720 (1992).

Similarly, the court in *In re Chase & Sanborn Corp.,* 848 F.2d 1196, 1199, (11th Cir.1988), thusly attempted to arrive at a definition of "transferee" by referring to the "control test" used to determine whether a debtor is in "possession" of funds:

> The test articulated by our court is a very flexible, pragmatic one; in deciding whether debtors had controlled property subsequently sought by their trustees, courts must "look beyond the particular transfers in question to the entire circumstance of the transactions." *In re Chase & Sanborn Corporation,* 813 F.2d [1177,] at 1181–82 [(11th Cir.1987)].

The control test, then, as adopted by this circuit, simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable concepts underlying the bankruptcy law. *See, Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966) (noting that "equitable principles govern the exercise of bankruptcy jurisdiction"); *In re Chase & Sanborn Corporation,* 835 F.2d 1341, 1349 (11th Cir.1988); [*In re Colombian*

*Coffee Co., Inc.,*] 75 B.R. [177] at 179–80 ... [T]he general approach ... applies regardless of whether a court is attempting to determine whether a debtor controlled the transferred funds or a defendant gained control over the funds transferred to it.

As noted by the court, "we are not creating new law, or even expanding on the existing doctrine ... [b]ankruptcy courts considering the question of whether a defendant is an initial transferee have traditionally evaluated that defendant's status in light of the entire transaction." *Id.* Accordingly, the court went on to note it would be "inequitable" to allow recovery against an entity merely because it had "technically ... received the funds ...," if the entity had "never actually controlled the funds." *Id.* at 1200.

■ Applying the "control test" to this case, the logical conclusion is that Lori cannot be considered an "initial transferee" at all. This is because Lori lacked "dominion" over the monies in question. *Bonded, supra,* 838 F.2d at 893. As noted by the Ct.App. in *Blatstein IV,* Lori was merely a pawn who used the monies deposited into her accounts where Blatstein directed her to do so. 192 F.3d at 98. As a result, per the Ct.App.'s analysis, Blatstein retained control over the monies despite nominally transferring them to Lori. *Id.* An entity does not have "dominion over the money" until it is, in essence, "free to invest the whole [amount] in lottery tickets or uranium stocks." *Bonded, supra,* 838 F.2d at 894. *See also, In re Baker & Getty Financial Services, Inc.,* 974 F.2d 712, 722 (6th Cir.1992); *Lippi v. City Bank,* 955 F.2d 599, 611 (9th Cir.1992); *In re Bullion Reserve of North America,* 922 F.2d 544, 549 (9th Cir.1991); *In re Columbia Data Products,* 892 F.2d 26, 28 (4th Cir.1989); *In re Harbour,* 845 F.2d 1254, 1256–58 (4th Cir.1988); *In re Richmond Produce Co.,* 151 B.R. 1012, 1021 (Bankr. N.D.Cal.1993), *aff'd* 195 B.R. 455 (N.D.Cal. 1996). In light of this analysis, the Trustee cannot prevail against Lori.

We note that we are not dealing here with realty or other property which was transferred to Lori and remains in her possession as its transferee. Rather, we are dealing with money which apparently has long since been spent. The only real issue is who should be liable, in monetary terms, for the passage of the funds at issue into Lori's accounts. It is difficult to see why Lori, who was, as noted, found to have been a mere pawn in Blatstein's transfer schemes, should be liable therefor. We reiterate that we have not found fraud of any kind to have been perpetrated by Lori, and we detect no language in *Blatstein IV* which holds to the contrary on this point.

We also note that the payees of the income to Blatstein were corporations co-owned by the Blatsteins. *See Blatstein IV,* 192 F.3d at 96. As a co-owner of these corporations, Lori had at least some claim of entitlement to the funds paid to Blatstein by these corporations, which would negate the notion that her mere receipt of Blatsteins's income implicated her in Blatstein's frauds.

■ We also find that the Blatsteins' position with respect to the joint and several liability arguments presented by the Trustee is correct. As the Blatsteins correctly observed, the trustee failed to cite any authority which, as a special penalty for the fraud and to render a judgment more easily collectible, would impose joint and several liability on an innocent nominal transferee simply because she was an instrument of the fraud. The instant factual setting, which we continue to believe does not reflect fraudulent transfers in the classic sense, *compare* the scenarios referenced at pages 303–304 *infra,* is a poor candidate for the first decision in history holding a transferor and transferee of a fraudulent conveyance jointly and severally liable on "equitable" or any other grounds.

We recognize that the remedy of a judgment against Blatstein alone is apparently perceived by the Trustee as a hollow one,

due to Blatstein's lack of personal assets. However, the remedy is the function of the nature of the transaction in issue. The transfers which the Ct.App. found to be fraudulent were transfers from one possibly judgment-proof person (Blatstein) to another (Lori). It is difficult to see how such transfers served the classic purpose of a fraudulent conveyance, *i.e.*, transferring assets out of an entity vulnerable to loss of its assets into another not perceived as so vulnerable.

We do not have to look far to find examples of such a classic fraudulent conveyance and see how the transaction at issue is different. The transfer of Philly Rock out of Main, which Blatstein perceived as vulnerable to liquidation by his creditors and Trustee Miller, to a new entity not perceived as so vulnerable, *i.e.*, Columbusco, Inc., was a classic fraudulent conveyance. Framing a remedy, *i.e.*, re-transfer of Philly Rock to the Main Trustee, was therefore fairly easy to accomplish. *See also In re Martin's Aquarium, Inc.*, 225 B.R. 868 (Bankr.E.D.Pa.1998), *final dispensation*, 1999 WL 172782 (Bankr. E.D.Pa. March 24, 1999) (seizure of valuable aspect of debtor's business by its principal remedied by reconveyance of the asset taken and monetary damages against the principal for his profits in making wrongful use of the asset taken).

The hollowness of the Trustee's remedy is therefore a function of the nature of the transactions at issue. Far from being classic fraudulent conveyances, it is difficult to perceive any clear judgment-evading consequences from the transfer from Blatstein to Lori. The hollow remedy is thus befitting the hollow transactions which they challenge. We perceive no equity in allowing the Trustee to, without supporting authority, artificially utilize these transactions to obtain a windfall which they would not otherwise support. We are not inclined to do so just because the Trustee's special counsel put a great deal of effort, which we find frankly excessive, into this matter.

At this end point in this long sequence of decisions, we also must point out that the number of opinions written to date in these matters is an indication that few issues have been resolved consensually, despite numerous efforts, by particular the Dist. Ct., to facilitate settlements. This phenomena strongly suggests that the thrust of the Trustees' actions has been to litigate these matters to their farthest extent, rather than to settle them. The Trustees have the duty, in administration of these estates, to prevent further proliferation of litigational excesses in yet further appeals. This court has only one weapon at its disposal to control such excesses: its rulings on fee applications. We urge the parties to keep this in mind, as well as the public interest served by resolving controversies.

## 5. *The Trustee Is Not Entitled to Any Further Relief.*

 The only issues remaining to be addressed are the Trustee's demands for pre-judgment interest and equitable relief. Pre-judgment interest is generally allowable only when a party defendant is liable to pay a sum "ascertainable by computation" at the outset of the litigation. *See In re Repco Products Corp.*, 100 B.R. 184, 202–03 (Bankr.E.D.Pa.), *aff'd*, C.A. No. 89–5514 (E.D.Pa. Sept. 8, 1989).

The sum at issue in this litigation is, as we noted at page 299 *supra*, an ever-upward moving target. Moreover, we found that the Trustee's figure of what was claimed to be at issue was less than half the amount at which we ultimately fixed the Trustee's damages.

 The *Rizzo* case cited by the Trustee does support the principle that pre-judgment interest may also be awarded if, in the discretion of the court, such an award is necessary to compensate a party from whom funds have been wrongfully procured or withheld. 520 Pa. at 509, 555 A.2d at 70. However, the funds in issue, although found to have been wrongfully

transferred, were not wrongfully procured or withheld from the Trustee. The rights of the Trustee were less than clear, since this court and the Dist.Ct. refused to find any fraudulent transfers. In such circumstances, enhancement of the Trustee's judgment by adding pre-judgment interest is unwarranted.

As to the Trustee's request for equitable remedies and prejudgment interest claims, we decline to grant them. The Blatsteins correctly point out that the actions at issue here, although found to be fraudulent in *Blatstein IV*, were rather technical determinations found, by the Ct.App., to involve the transfer of funds to defraud, principally, the Internal Revenue Service ("the IRS"). The IRS, though not known to be shy in enforcing its rights, has never joined the Trustees in their seemingly endless pursuit of the Blatsteins. As we noted in *Main X*, 242 B.R. at 592, the penalties imposed upon the Blatsteins to date are sufficiently substantial that they have begun to exceed those justified by the wrongdoings at issue. As we noted at page 304 *supra*, excesses by the Trustees appear to be the recent rule of the day. Further equitable relief to the Trustee is not justified in these circumstances.

Therefore, the sole appropriate remedy for the Trustee is a judgment in the amount of the fraudulent transfers at issue against the only party found to have participated a fraud in the transfers in issue, as prescribed by 12 Pa.C.S. § 5107(a)(1) of PUFTA, *i.e.*, Blatstein. We will consequently award a judgment in the amount of $1,533,428.65 in favor of the Trustee against Blatstein only.

### D. *CONCLUSION*

An order which is consistent with the conclusions which we have reached in this Opinion follows.